**MORGAN, LEWIS & BOCKIUS LLP**
(*A Pennsylvania Limited Liability Partnership*)
John McGahren
Stephanie Feingold
502 Carnegie Center
Princeton, NJ  08540
Tel:  609-919-6600
Fax:  609-919-6701
*Attorneys for Plaintiff Sun Chemical Corp.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUN CHEMICAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>FIKE CORPORATION AND SUPPRESSION SYSTEMS INCORPORATED,<br><br>Defendants. | Civil Action No.: 2:13-CV-4069 (JMV) (MF)<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO STRIKE EXPERT REPORTS OF WALTER FRANK, STEVE ARNDT, JACK OSBORN, JOHN CHOLIN, AND JOHN PUND**<br><br>**Motion Return Date: January 3, 2017** |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.    LEGAL ARGUMENT ......................................................................................... 4

    a.    Standard on Motions to Strike Expert Reports ................................... 4

    b.    Defendants Submitted Multiple Affirmative Reports Dressed Up As Responsive Reports, Thus Willfully Violating the Court's Scheduling Order and Severely Prejudicing Plaintiff ........................................................................... 7

        i.    Walter Frank ............................................................................ 9

        ii.    Steve Arndt ............................................................................ 13

        iii.    Jack Osborn ........................................................................... 17

        iv.    John Cholin ............................................................................ 19

    c.    To Varying Degrees, All of Defendants' Expert Reports Impermissibly Cite to or Rely on the U.S. Chemical Safety and Hazard Investigation Board's January 2015 Report, and the Court Should Strike All Such References ................................... 23

    d.    The Arndt Report Is Replete with Improper Legal Opinions that Should Be Stricken ............................................................................................. 24

    e.    The Pund Report Improperly Summarizes Several Depositions .................................... 29

    f.    Defendants' Eleventh-Hour Document Dumps Also Prejudiced Sun and Severely Hampered Its Ability to Depose Defendants' Experts ..................................... 30

    g.    Defendants Willfully Violated this Court's May 5, 2016 Order, Continuing Their Pattern of Dilatory and Non-Compliant Behavior Throughout the Pendency of Litigation ........................................................................................... 31

    h.    Granting Sun Additional Time to Depose Defendants' Experts Will Not Cure the Prejudice to Sun If Defendants Are Permitted to Proceed With Their New Theories at Trial, and Allowing the Evidence Would Disrupt the Orderly and Efficient Trial of the Case ............................................................. 33

III.    CONCLUSION ................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Asbestos Products Liability Litig. (No. VI),*
    Nos. 09–cv–74351x, 09–cv–74410–File, 2012 WL 661673 (E.D. Pa. Feb. 8, 2012) ................. *passim*

*Bd. of Trustees of Bricklayers and Allied Craftsmen Local 6 v. Wettlin Assocs., Inc.,*
    237 F.3d 270 (3d Cir. 2001) ............................................................................................... 28

*Belmont Condo. Ass'n, Inc. v. Geibel,*
    74 A.3d 10 (N.J. App. Div. 2013) ...................................................................................... 26

*Berckeley Inv. Group, Ltd. v. Colkitt,*
    455 F.3d 195 (3d Cir. 2006) ............................................................................................... 24

*Blake v. Securitas Sec. Servs.,*
    292 F.R.D. 15 (D.D.C. 2013) ........................................................................................ *passim*

*Christensen v. Harris Cnty.,*
    529 U.S. 576 (2000) ........................................................................................................... 28

*Crowley v. Chait,*
    322 F. Supp. 2d 530 (D.N.J. 2004) ........................................................................... 24, 28, 29

*D&D Assocs., Inc. v. Bd. of Educ. of N. Plainfield,*
    411 F. Supp. 2d 483 (D.N.J. 2006) .................................................................................... 5, 9

*Donell v. Fidelity Nat'l Title Agency of Nev.,*
    No. 07–00001, 2012 WL 170990 (D. Nev. Jan. 20, 2012) ................................................. 6

*Fitz, Inc. v. Ralph Wilson Plastics Co.,*
    184 F.R.D. 532 (D.N.J. 1999) .......................................................................................... 5, 9

*Heyert v. Taddese,*
    70 A.3d 680 (N.J. App. Div. 2013) ............................................................................... 25, 26

*Lindner v. Meadow Gold Dairies, Inc.,*
    249 F.R.D. 625 (D. Haw. 2008) .......................................................................................... 5

*Main Tubular Prod., Inc.,*
    1980 O.S.H. Dec. (CCH) ¶ 24,668 (O.S.H.R.C. A.L.J. July 18, 1980) .............................. 27

*In re Mercedes-Benz Anti-Trust Litig.,*
    225 F.R.D. 498 (D.N.J. 2005) ....................................................................................... 6, 7, 9

*Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.,*
    60 F.3d 153 (3d Cir. 1995) .................................................................................................. 6

*Nicholas v. Pa. State Univ.*,
   227 F.3d 133 (3d. Cir. 2000) ............................................................................. 7

*Reckitt Benkiser Inc. v. Tris Pharma, Inc.*,
   No. 09–3125, 2011 WL 6722707 (D.N.J. Dec. 21, 2011) ............................ 7, 34

*Robert S. v. Stetson Sch., Inc.*,
   256 F.3d 159 (3d Cir. 2001) ........................................................................ 1, 19

*Salas v. Carpenter*,
   980 F.2d 299, 305 (5th Cir. 1992) ................................................................... 29

*SEC v. Lipson*,
   46 F. Supp. 2d 758 (N.D. Ill. 1998) ............................................................... 29

*Thiedemann v. Mercedes–Benz USA*,
   872 A.2d 783 (N.J. 2005) ................................................................................ 25

*United States v. Dukagjini*,
   326 F.3d 45 (2d Cir. 2003) .............................................................................. 29

*Withrow v. Spears*,
   967 F. Supp. 2d 982 (D. Del. 2013) ........................................................ 1, 13, 19

*Wyeth Holdings Corp. v. Sandoz, Inc.*,
   Civil Action No. 09–955–RGA–CJB (D. Del. Mar. 14, 2012) ......................... 1

**Statutes**

42 U.S.C. § 7412(r)(6)(G)........................................................................... 1, 3, 23

New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.* ................... *passim*

**Other Authorities**

Fed. R. Civ. P. 7.1 ................................................................................................ 33

Fed. R. Civ. P. 26 ............................................................................................. 5, 8

Fed. R. Civ. P. 26(a) ....................................................................................... 3, 5, 6

Fed. R. Civ. P. 26(a)(1)(A) .................................................................................. 5

Fed. R. Civ. P. 26(a)(2) ....................................................................................... 32

Fed. R. Civ. P. 26(a)(2)(B) ................................................................................... 8

Fed. R. Civ. P. 26(a)(2)(B) ................................................................................... 4

Fed. R. Civ. P. 26(a)(2)(B)(v) .............................................................................. 1

Fed. R. Civ. P. 26(a)(2)(C) ................................................................................... 4

Fed. R. Civ. P. 26(a)(2)(D)(ii) ................................................................................ 4, 8, 32

Fed. R. Civ. P. 26(a)(2)(D)(ii) ..................................................................................... 1

Fed. R. Civ. P. 37 ......................................................................................................... 6

Fed. R. Civ. P. 37(c)(1) ......................................................................................... 3, 5, 9

Fed. R. Civ. P. 37(c)(1) ............................................................................................ 1, 5

Fed. R. Evid. 403 .................................................................................................. 1, 19, 29

Pursuant to Fed. R. Civ. P. 26(a)(2)(D)(ii), 37(c)(1), and 42 U.S.C. § 7412(r)(6)(G), Plaintiff Sun Chemical Corporation ("Sun") moves to strike in part or in whole the Expert Reports and Testimony of Walter Frank ("Frank"), Steve Arndt ("Arndt"), Jack Osborn ("Osborn"), John Cholin ("Cholin"), and John Pund ("Pund"), experts for Defendants Fike Corporation and Suppressions Systems, Inc. (collectively, "Defendants").[1]

## I.    INTRODUCTION

On October 9, 2012, an explosion rocked Sun Chemical Corporation's ("Sun") US Ink facility in East Rutherford, New Jersey, sparking a fire that injured seven workers and shut down Sun's black ink manufacturing operations at that facility (the "Incident"); those operations remain shuttered to this day.  Less than nine days earlier, Suppression Systems, Inc. ("SSI") had completed the installation, check-out, and arming of a new Fike explosion protection system in the East Rutherford facility, for the express purpose of suppressing and isolating explosions within the dust collection system.  Sun had purchased the Fike system a few months earlier, based on representations from Fike Corporation ("Fike") and SSI concerning the protection the system would provide.  Those representations proved to be misleading and false, and, as a result, Sun has incurred millions of dollars in damages.

On July 1, 2013, Sun filed this action against Defendants, asserting a single claim under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq*. ("NJCFA"), alleging that the Fike explosion suppression and isolation system it purchased ("Fike system") following multiple meetings with, and representations from, Defendants' representatives, did not perform as promised by Defendants.  Following multiple extensions at Defendants' request, fact discovery in this action finally closed in late 2015.  In

---

[1] Defendant's Expert Reports are referred to throughout this Memorandum of Law as the "Frank Report," "Arndt Report," "Osborn Report," "Cholin Report," and "Pund Report," respectively, and are attached hereto as Exhibits 1 through 5.

accordance with this Court's Order of May 5, 2016 (the "Scheduling Order") (Dkt. 119), Sun timely and properly served on Defendants affirmative reports from three experts in support of its sole claim: (1) Dr. Timothy Myers, who opined that the Fike system did not conform to the representations made by Fike, (2) Dr. Patrick Murphy, who concluded that the alarms within the Fike system were not audible to Sun's employees, even though Defendants represented that the Fike system complied with certain specified standards and certifications, including those requiring audible alarms, and (3) Raymond Dovell, CPA, who verified and opined on Sun's damages as a result of the Incident.

In marked contrast, Defendants flouted the Scheduling Order (Dkt. 119 at ¶¶ 1-2), which set deadlines of June 29, 2016, for submission of all *affirmative* expert reports and August 29, 2016 for all *responding* expert reports. Rather than serving affirmative expert reports by June 29, Defendants ambushed Plaintiff with five expert reports served on August 29,[2] ostensibly in "response" to Plaintiff's three reports.

As set forth more fully herein, the Frank, Arndt, and Osborn reports are completely unresponsive to any of Sun's expert reports and are also unquestionably *affirmative* reports, meaning that they should have been served on June 29, 2016, not two months later on August 29th (thereby denying Plaintiff the opportunity to present its own responding reports and also limiting Plaintiff's time to evaluate these new theories and depose Defendants' experts to 30 days, as opposed to the 60-day period available for affirmative experts).   In addition, the majority of the content of the Frank report was created *over a year ago* as part of Mr. Frank's affidavit filed with the court in the related state court product liability action

---

[2] While the Pund report was, unlike Fike/SSI's other expert reports, largely responsive to Mr. Dovell's report opining on Sun's damages, even that report contains impermissible material that should be stricken (*see infra*).

2

(the "State Court Action"),[3] and therefore, the opinions contained therein could not possibly have been formed as a response to Sun's expert reports in support of Sun's NJCFA claim. The vast majority of the 91-page Cholin expert report suffers from similar defects by blatantly failing to respond to any of Sun's reports until the last one-third of the report and instead spending nearly two-thirds of the report on reconstructing the Incident according to his theories of what occurred.   Furthermore, like Mr. Frank, Mr. Cholin also filed an affidavit in the state court action over a year ago.   The opinions in Mr. Cholin's report mirrored many of those contained in his affidavit, accentuating the fact that the majority of his report was not formed in response to Sun's expert reports.   For these reasons, the Frank, Arndt, and Osborn reports, as well as the first 58 pages of the Cholin report, were untimely under Rule 26(a) and should be stricken accordingly under Rule 37(c)(1).

In addition, each expert report impermissibly cites to and/or relies on the January 2015 U.S. Chemical Safety and Hazard Investigation Board ("CSB") report ("CSB Report") containing the agency's findings and conclusions from its investigation of the Incident, in contravention of 42 U.S.C. § 7412(r)(6)(G) (which expressly prohibits the use of the agency's findings, conclusions or recommendations in *any* form in any private action for damages).   To the extent each of Defendants' reports cites to or derives content from the CSB Report or any of its findings, conclusions or recommendations, those portions should be stricken.

Opinion 3 of the Arndt report should be stricken for the further reason that it contains impermissible legal opinions that usurp the role of the Court in (erroneously) interpreting the necessary elements to prevail on an NJCFA claim and opining on the application of OSHA letters of interpretation to Sun's US Ink facility.   Similarly, those portions of the

---

[3] *Jaje, et al. v. United Air Specialists, et al.* (Consolidated), Docket No. MID-L-5595-14.

Pund report that merely summarize and repeat testimony from two witnesses should be stricken because they improperly usurp the role of the jury and distort the witnesses' testimony.

Finally, the prejudice to Sun caused by these untimely and otherwise improper "affirmative" expert reports was exacerbated by Defendants' 11th-hour documents dumps on Sun immediately before (and even after) each of Defendants' expert witness depositions, flagrantly ignoring Plaintiff's clear requests for productions of the documents relied upon or cited by its experts one week in advance of each deposition.  Indeed, Defendants' untimely disclosures are only the latest in their established pattern of ignoring filing and discovery deadlines under the Federal Rules of Civil Procedure and the Court's prior Scheduling Orders during the entire course of this litigation, as described more fully below in Section II(c).

For the foregoing reasons, Sun requests that this Court strike the Frank, Arndt, and Osborn reports in their entirety, as well as those portions of the Cholin and Pund reports identified below.

## II.   <u>LEGAL ARGUMENT</u>

### a.   **Standard on Motions to Strike Expert Reports**

A responding, or "rebuttal," report must be "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), . . ." Fed. R. Civ. P. 26(a)(2)(D)(ii).  "Such testimony cannot be used to advance new arguments or new evidence. . . . Rather, rebuttal testimony must explain, repel, counteract, or disprove evidence of the adverse party." *Blake v. Securitas Sec. Servs.*, 292 F.R.D. 15, 17 (D.D.C. 2013) (striking plaintiff's expert report, in part, because it "respond[ed] to an argument that appears nowhere in the opinions of Defendant's experts") (internal citations

and quotation marks omitted); *see also In re Asbestos Products Liability Litig. (No. VI)*, Nos. 09–cv–74351x, 09–cv–74410–File, 2012 WL 661673, at *3 (E.D. Pa. Feb. 8, 2012) (recommending striking the plaintiff's so-called rebuttal expert report because it did "not directly rebut the defendant's experts," nor did it "suggest that he intended to rebut or respond to Defendant's experts."); *adopted and approved*, 2012 WL 661660 (E.D. Pa. Feb. 29, 2012); *Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 638 (D. Haw. 2008) (striking the plaintiff's expert report addendum because it was based on new evidence that was not within the scope of the third-party defendant's expert reports).

Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Rule 26(a) extends to the timely disclosure of expert reports. *See, e.g., D&D Assocs., Inc. v. Bd. of Educ. of N. Plainfield*, 411 F. Supp. 2d 483, 486 (D.N.J. 2006) ("Fed. R. Civ. P. 37(c)(1) precludes a party from using an expert opinion if it does not comply with the requirements of Fed. R. Civ. P. 26(a)."); *Fitz, Inc. v. Ralph Wilson Plastics Co.*, 184 F.R.D. 532, 535-36 (D.N.J. 1999) ("Failure to comply with Rule 26 regarding expert witnesses is only harmless when there is no prejudice to the party entitled to disclosure" and noting that "Rule 37(c)(1), Fed. R. Civ. P., provid[es] for the imposition of *mandatory sanctions* upon failure to comply with Rule 26," absent substantial justification or harmless error) (emphasis added).

> [Rule 37(c)(1)] does not define harmless, but the 1993 Advisory Committee Notes give examples of situations in which the failure to disclose may either be substantially justified or harmless: "the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a pro se litigant of the requirement to make disclosures."

5

*In re Mercedes-Benz Anti-Trust Litig.*, 225 F.R.D. 498, 506 (D.N.J. 2005). What Defendants did goes far beyond the types of harmless error courts have identified and was intentionally done to prejudice Sun. "*Rule 37 is written in mandatory terms*, and 'is designed to provide a strong inducement for disclosure of Rule 26(a) material.'" *Id. at* 505 (emphasis added) (quoting *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 156 (3d Cir. 1995)).

> Where a party attempts to designate as a "rebuttal" expert someone whose proposed testimony is beyond the scope of appropriate rebuttal, *that witness may be viewed as an initial expert who was not timely designated and whose testimony may be struck by the Court for violating Rule 26(a) and the Court's governing scheduling order. See, e.g., Donell v. Fidelity Nat'l Title Agency of Nev.*, No. 07–00001, 2012 WL 170990, at *4 (D. Nev. Jan. 20, 2012) ("[I]t is clear that Brooks was *always intended to testify as an initial expert witness for the Plaintiff*. Plaintiff failed to designate him as an initial expert and is now improperly attempting to use him as a rebuttal expert to obtain an extension of the deadline for designating an initial expert.").

*Blake*, 292 F.R.D. at 18 (emphases added).  That is precisely what Defendants have done here.

The Arndt, Frank, and Osborn reports and nearly two-thirds of the Cholin report, while submitted as "responsive" reports, are clearly affirmative reports that should have been disclosed on June 29, 2016, as clearly set forth in the Scheduling Order (Dkt. 119). There is no substantial justification for Defendants' delay in disclosing these reports, and their failure to timely produce these reports was not harmless.  *See In re Mercedes-Benz Anti-Trust Litig.*, 225 F.R.D. at 506 (citing 1993 Advisory Committee Notes).

Courts in the Third Circuit examine four factors to determine whether a party that has failed to disclose evidence was substantially justified or whether the failure to disclose was harmless: "(1) the prejudice or surprise of the party against whom the excluded evidence

6

would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or wilfulness in failing to comply with a court order or discovery obligation." *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d. Cir. 2000).  The Court should also consider the importance of the evidence to be excluded.  *See In re Mercedes-Benz Anti-Trust Litig.*, 225 F.R.D. at 506; *Reckitt Benkiser Inc. v. Tris Pharma, Inc.*, No. 09–3125, 2011 WL 6722707, at *6 (D.N.J. Dec. 21, 2011).  As discussed below, review of these four factors demonstrates that Defendants' reports must be stricken.

**b.      Defendants Submitted Multiple Affirmative Reports Dressed Up As Responsive Reports, Thus Willfully Violating the Court's Scheduling Order and Severely Prejudicing Plaintiff.**

Defendants willfully violated the Scheduling Order by serving multiple expert reports under the guise of "responsive" reports on August 29, 2016, when they were, in fact, affirmative expert reports that should have been disclosed to Sun on June 29, 2016.  By designating their five expert reports as "responsive" (only one of which was an actual responsive report) and serving them on August 29, 2016, Defendants limited Plaintiff to only <u>thirty</u> days to prepare for and depose Defendants' <u>five</u> experts (with no opportunity to respond),[4] whereas Defendants had <u>sixty</u> days to review and "respond" to Plaintiff's <u>three</u> experts, followed by time to prepare for Plaintiff's expert depositions.  (*See* Dkt. 119). There is a reason why more time was built into the *agreed to* scheduling order: to provide the recipient of an affirmative expert report with time to evaluate new arguments and expert opinions and respond to them, and avoid exactly the type of prejudice Plaintiff was

---

[4] As discussed below, even being provided an opportunity to respond would not cure the prejudice to Plaintiff, since these affirmative "responding" reports go well beyond the scope of the issues in this litigation.

7

subjected to here.[5]   Instead, Plaintiff had only half of the time allotted to Defendants to review and evaluate the new expert theories contained in Defendants' experts' affirmative reports, which prejudice was compounded by a severely compressed deposition schedule of Defendants' experts (*see* table below, showing Plaintiff was forced to depose Defendants' expert witnesses over the course of five consecutive business days, concluding just before the September 30, 2016 deadline set by the Court).

Furthermore, the majority of Defendants' expert reports do not actually refute or rebut Plaintiff's reports, but are instead affirmative reports espousing alternative (and entirely new) theories for why Defendants purportedly are not responsible for Plaintiff's damages, such as pointing to unrelated purported design defects of entirely different parts of the larger system.   This clearly violates the intent of Fed. R. Civ. P. 26(a)(2)(D)(ii) (stating a rebuttal report must be "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), . . ."); *see also Blake*, 292 F.R.D. at 17 (striking plaintiff's expert report, in part, because it "respond[ed] to an argument that appears nowhere in the opinions of Defendant's experts"); *In re Asbestos Products Liability Litig.*, 2012 WL 661673, at *3.   Indeed, the Court in *In re Asbestos Products Liability Litigation* struck Defendants' expert reports for exactly this reason, as it explained:

> the report does not comply with Rule 26 of the Federal Rules of Civil Procedure. In addition to presenting few, if any, refuting arguments made by the opposing party, Dr. Millette's report introduces new arguments for which the plaintiff has the burden. . . .  The submitted evidence is not merely intended to solely rebut on the same subject matter, *but rather to offer additional expert evidence well beyond the scope of the Plaintiff's expert reports, including new opinions.*

---

[5] Significantly, the scheduling order expressly provided for submission of "affirmative" and "responding" reports, not "plaintiff" and "defendants" reports.  *See* Dkt. 119.

*Id.* (emphasis added).

Here, the theses of the Arndt, Frank, and Osborn reports, and much of the Cholin report, bear no relationship whatsoever to the content of Sun's affirmative reports.  For instance, whether the deflagration *started* because of an allegedly faulty design of ductwork (which discussion appears nowhere in Sun's reports) has nothing to do with either the audibility of the Fike system alarms or whether the Fike system failed to prevent a deflagration that involved the dust collector from escalating and injuring Sun's workers and impairing its business operations.  Indeed, it is patently obvious that Defendants are either using this NJCFA action as a test run for the expert reports for the personal injury and products liability claims in the State Court Action or are simply submitting their state court expert reports in this case, neither of which the Court should countenance.

Because Defendants' reports offer alternative explanations for the "cause" of the Incident that go "well beyond the scope of Plaintiff's expert reports, including new opinions," while also failing to address the actual opinions expressed by Sun's experts, they are affirmative reports that should have been disclosed on June 29, 2016, not two months later, and should be stricken for that reason alone.  *See* Fed. R. Civ. P. 37(c)(1); *D&D Assocs.,* 411 F. Supp. 2d at 486; *Fitz,* 184 F.R.D. at 535-36; *In re Mercedes-Benz Anti-Trust Litig.*, 225 F.R.D. at 506; *Blake*, 292 F.R.D. at 17-18.

i.     Walter Frank

The Frank report is perhaps the most egregious of Defendants' attempts to disguise an affirmative report as a responsive report.  At the outset, Mr. Frank, who can best be described as an expert in occupational safety matters, including hazard assessment and best practices for identifying work hazards, testified that his report does not respond to Dr. Murphy's report at all, only Dr. Myers' report.  Frank Dep. Tr. at 68:1-9 (the "report

responds to Dr. Myers' report" only), attached hereto as Exhibit 6.  He then went on to

testify that he is not providing an opinion on the Fike system (*see* Frank Dep. Tr. at 68:18-

69:3) (when asked whether he provided any opinions about the Fike system, he responded,

"no, not about the equipment, no."), which is the sole basis for the Myers report (*see* Myers

report at 1 ("I was retained by Morgan, Lewis & Bockius LLP to investigate the role of the

Fike explosion and suppression system on the incident that occurred on October 9, 2012 . . .

."), attached hereto as Exhibit 7).  In fact, Mr. Frank admitted that nowhere in his report

does he explicitly address Dr. Myers' conclusions, despite purporting to disagree with them.

*See* Frank Dep. Tr. at 71:20-21 (stating he does not dispute Dr. Myers' Conclusion 5); 72:2-

73:11 (acknowledging he does not "explicitly address the assertion[s]" in Dr. Myers'

Conclusions 3 and 4); 86:18-87:12 (deferring to the Cholin report on Dr.  Myers'

Conclusion 2 because it is "beyond the scope of what I was asked to look at.").[6]

Mr. Frank purportedly addresses Dr. Myers' Conclusion 1 in his report.  *See* Frank

Rep. at 3 ("It is also my opinion that the failures described are not related to the selection of,

or representations regarding, the Fike equipment sold to Sun."), attached hereto as Exhibit 1.

But at his deposition, Mr. Frank admitted that while he reviewed the Fike brochures, he

---

[6] To the extent that Mr. Frank merely adopts Mr. Cholin's opinions as his own, they are
cumulative and unhelpful to the jury and should be stricken accordingly.  *See* Fed. R. Evid. 403
("The court may exclude relevant evidence if its probative value is substantially outweighed
by a danger of one or more of the following: . . . needlessly presenting cumulative
evidence."); *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 170 (3d Cir. 2001) (affirming
district court's exclusion of cumulative expert testimony) ("This testimony by Doughtery and
Prentky addressed the same issues that Robert sought to address through Burgess's
testimony. Therefore, the District Court had a reasonable basis for regarding that testimony
as cumulative, and the District Court did not abuse its discretion in limiting Burgess's
testimony."); *Withrow v. Spears*, 967 F. Supp. 2d 982, 1007, n.18 (D. Del. 2013) ("In *Wyeth*,
the stricken portions of the sur-rebuttal report not only failed to respond directly to the
defendant's reply report, but also: (1) would have prejudiced the defendant, because they
were cumulative to the testimony of another expert plaintiffs were to put forward at trial; . .
.") (citing *Wyeth Holdings Corp. v. Sandoz, Inc.*, Civil Action No. 09–955–RGA–CJB (D.
Del. Mar. 14, 2012).

"didn't feel the need to cite any content from them in my report," and he "didn't believe" they otherwise contained information he used in his report.  Frank Dep. Tr. at 107:12-108:1.  Thus, by Mr. Frank's own words, the Frank report does not respond directly to any of Plaintiff's expert reports and should be stricken.[7]

At his deposition, Mr. Frank admitted that he "was asked to opine on the topic of process safety management and how proper application of process safety management at Sun could have prevented this incident."  Frank Dep. Tr. at 14:9-14.  Neither Dr. Myers or Dr. Murphy, however, have provided opinions in their reports concerning process safety management (or the related process hazard analysis and management of change).  Mr. Frank himself acknowledged that many points he raised in his report do not respond to any specific points that Dr. Myers makes.  *See e.g.,* Frank Dep. Tr. at 85:4-7 (recalling that Dr. Myers does not discuss process hazard analyses in his report); 144:2-5 ("I do not believe it responds – replies to a particular point, . . ."); *see also id. at* 159:10-23 ("I don't see any reference to HSE 065."); 167:17-19 (interlocks); 175:11-13 (system balancing); 194:24-195:2 (manifolding); 202:12-14 (electrical equipment classification).   The Frank report plainly goes well beyond the boundaries of Plaintiff's expert reports in its attempt to sweep in any and every possible action that Sun should have allegedly taken to avoid the circumstances purportedly leading up to the Incident, instead of actually addressing the opinions expressed in Sun's expert reports head-on, and the Court should strike it in its entirety.  *See Blake*, 292 F.R.D. at 17 (striking expert report, in part, because it "respond[ed] to an argument that appears nowhere in the opinions of Defendant's experts"); *In re Asbestos Products Liability Litig. (No. VI)*, 2012 WL 661673, at *3 (striking expert report,

---

[7] Given that the Dovell report concerned the nature and amount of Sun's cost damages, the Frank report clearly does not respond to that report, either.

in part, because it was "not merely intended to solely rebut on the same subject matter, but rather to offer additional expert evidence well beyond the scope of the Plaintiff's expert reports, including new opinions.").

Finally, Mr. Frank clearly formed his opinions long before Sun propounded its expert reports on Defendants on June 29, 2016. His "responsive" report could thus not possibly have been a response to Sun's expert reports, given that Mr. Frank authored an affidavit in October 2015 (attached hereto as Exhibit 8) *over one year ago* in the related state court products liability and personal injury action, which his current expert report in this case largely mirrors. Review of that affidavit confirms that Mr. Frank's opinions had already been formed more than nine months before he ever saw Plaintiff's expert reports. A side-by-side comparison of Mr. Frank's August 29, 2016 report with his October 2015 affidavit clearly demonstrates the overlapping content between the two documents:

| Frank August 29, 2016 Report | Frank October 2015 Affidavit |
| --- | --- |
| Paragraph 2 | Paragraph 6 |
| Paragraph 6 | Paragraph 7 |
| Paragraph 7 | Paragraph 8 |
| Paragraph 10 | Paragraph 9 |
| Paragraph 12 | Paragraph 10 |
| Paragraphs 10 and 12 | Paragraph 12 |
| Paragraph 10 | Paragraph 13 |
| Paragraph 12 | Paragraph 14 |
| Paragraph 13 | Paragraph 16 |
| Paragraph 14 | Paragraph 17 |
| Paragraph 10 | Paragraphs 18 and 19 |

| Paragraphs 16 and 17 | Paragraph 20 |
| --- | --- |
| Paragraph 22 | Paragraph 21 |
| Paragraph 23 | Paragraph 22 |
| Paragraph 22 | Paragraph 23 |
| Paragraph 21 | Paragraph 24 |
| Paragraph 21 | Paragraph 25 |
| Final paragraph on page 23 | Paragraph 28 |

Although Mr. Frank acknowledged that he "drew some content from the affidavit" when preparing his report (Frank Dep. Tr. at 69:17-21), what he did goes well beyond drawing "some content" from his prior work.  Indeed, he freely admitted that the paragraphs listed in the table above between his expert report and affidavit "correspond[ed]" with each other or "communicated the same message."  *See* Frank Dep. Tr. at 208:1-216:11.  Mr. Frank's report *could not possibly* have been a response to Dr. Myers' report, and it should be stricken in its entirety as an improper "rebuttal" report. *See Blake*, 292 F.R.D. at 18; *In re Asbestos Products Liability Litig. (No. VI)*, 2012 WL 661673, at \*3; *Withrow*, 967 F. Supp. 2d at 1007, n.18.

  ii. <u>Steve Arndt</u>

Like the majority of Fike's experts, Dr. Arndt, who describes himself as a "human factors" expert, tries to paint his report as refuting Sun's experts' "arguments" – arguments that are not actually stated in Plaintiff's experts' reports themselves, likely because Sun's experts are engineers and accountants rendering hard, scientific expert opinions within those disciplines.  *See Blake*, 292 F.R.D. at 18 (striking plaintiff's expert report because it "respond[ed] to an argument that appears nowhere in the opinions of Defendant's experts,"

in particular because "Defendant's experts Dorn and Levinson are security experts—not psychologists [like the plaintiff's expert]—and they offer no opinion on Blake's mental state."). Dr. Arndt defines the field of "human factors" as "the study of the capabilities and limitations of people as they interact with systems, organizations, technology, other people, and information and environment." Arndt Dep. Tr. at 26:6-10, attached hereto as Exhibit 9. Such an expert clearly has no relevance to the engineering analyses contained in Sun's expert reports.

Dr. Arndt's report twists Dr. Myers and Dr. Murphy's opinions in an awkward (and unsuccessful) attempt to reframe their scientific analyses into a "human factors" narrative that fits his pre-determined conclusions. For example, Dr. Arndt's report stated that he disagrees with Dr. Myers' and Dr. Murphy's conclusions regarding Sun's NJCFA claim (*see* Arndt Rep. at 12, 15, attached hereto as Exhibit 2) ("Plaintiff's experts, Dr. Myers and Dr. Murphy have posited that the Fike suppression and isolation equipment is in violation of CFA . . . ." and "Dr. Myers opines that the Fike document stating, 'Fike systems have never experienced a system failure in the field,' is a violation of CFA…."). At his deposition, however, he acknowledged that neither Dr. Myers nor Dr. Murphy actually discuss the NJCFA in their reports (*see* Arndt Dep. Tr. 115:7-16; 116:4-17, attached hereto as Exhibit 9). Instead, it appears Dr. Arndt claims that Dr. Myers and Dr. Murphy make these statements to enable his opinions to appear "responsive" to their reports. Moreover, Dr. Arndt admitted that he is not challenging the actual substance of Dr. Murphy's report, *i.e.*, the accuracy of Dr. Murphy's sound measurements, as noted in Opinion 1 of his report. *See* Arndt Dep. Tr. at 135:8-14.

As for Dr. Myers' report, Dr. Arndt's Opinion 2 largely regurgitates conclusions from other experts (*i.e.*, are not Dr. Arndt's own opinions) in an effort to refute Dr. Myers' conclusion that Defendants' promotional materials were inaccurate when presented to Sun (*see* Myers report, attached hereto as Exhibit 7).   For instance, in Opinion 2, Dr. Arndt concludes that the Incident "was not caused by a fire or deflagration that started within the dust collection unit".   Arndt Rep. at 13-14.   Yet, he also testified numerous times that he was "offering no opinions on causation."   Arndt Dep. Tr. at 142:20-24; *see also* Arndt Dep. Tr. at 152:11-15 ("I'm not offering any opinions on cause and origin."); 221:16-18 ("Again, that sounds like a cause-and-origin question and I am not qualified to talk about cause and origin.").   It was clear during his deposition that the source of any "cause-and-origin" opinions Dr. Arndt might hold come from other of Defendants' experts' reports or affidavits. Arndt Dep. Tr. at 71:5-8; 141:4-17; 143:1-19; 159:19-160:9.   Thus, when Dr. Arndt addresses section 2.3 of the Myers report, he concludes that based on his "understanding that the initiation of the event did not occur in the UAS dust collector," (*i.e.*, others' understanding), the Fike promotional materials were, indeed, accurate.   Dr. Arndt expressly limited his expertise to human factors, so he is admittedly not rendering an acoustical or electrical engineering opinion.   *See* Arndt Dep. Tr. at 25:23-26:2; 28:20-29:6; 136:23-137:6. These are summary opinions and the Court should strike these portions of Dr. Arndt's report as cumulative and redundant.[8]   *See* Fed. R. Evid. 403; *Robert S.*, 256 F.3d at 170; *Withrow*, 967 F. Supp. 2d at 1007, n.18.   Furthermore, as discussed below, the opinions upon which Dr. Arndt relies are themselves fatally defective, and must also be stricken.

---

[8] To the extent Dr. Arndt provides rationale in support of his conclusion that a "system failure" means something other than what it means in common parlance (and how Fike employees even described such failures in internal email communications), Sun refers the Court to its companion *Daubert* motion.

Finally, Dr. Arndt's Opinions 3 and 4 are entirely new theories that do not respond in any fashion to the Myers or Murphy reports (*see* discussion of Opinion 3 below in Section II(d)) and should accordingly be stricken outright as non-responsive to Sun's reports.  Dr. Arndt's Opinion 4 states that "[a]dditional or alternative warnings and/or instructions from Fike/SSI would not have altered the behaviors of US Ink employees, nor should instructions associated with response to a fire or explosion outside of the dust collector have come from Fike or SSI."  Arndt Rep. at 18.  Opinion 4 cannot possibly be considered a response to Dr. Murphy's report, which addressed the *audibility* of the Fike system's alarm, not whether "additional or alternative [*written*] warnings" would have prevented Sun's employees from being injured.  Indeed, the entirety of Opinion 4 is premised on whether *written* warnings, not audible alarms, could have altered Sun's employees' behavior in response to the Incident.  While Dr. Myers opined that Defendants had inadequately warned and trained Sun employees (*see* Myers Rep. at 13), the sole written warning he referred to directed employees to leave the area "upon indication of activation," without actually specifying what form that "indication" will take.[9]  As such, Opinion 4 fails to respond to Sun's expert reports and should be stricken.

_____

[9] Although some Sun employees, such as Mr. Jaje, may have noticed the small indicator light, Defendants did not adequately warn them as to the significance of these lights (*i.e.*, they were told they should call Fike/SSI, but were not told that the light signaled a hazardous condition, necessitating evacuation).  *See, e.g.*, Caddell Dep. Tr. at 183:16-19 ("Q. Were you told to evacuate the building if the light were anything other than green? A. No."), attached hereto as Exhibit 10; Jaje Dep. Tr. at 82:3-83:4, attached hereto as Exhibit 11; *see also* Murphy Report at 7-8 ("During this incident, an employee noticed that one of the lights within the Fike panel was illuminated continuously red, indicating that the Fike panel was in an alarm condition due to a potentially dangerous condition in the dust collection system.  This employee did not hear an alarm from the Fike panel at any point during the incident, despite being immediately in front of the Fike panel while the panel was in an alarm condition.  SSI connected, commissioned, and armed for service the Fike system at the Sun Chemical facility on September 14 and October 1, 2012, and have verified that the Fike panel was in alarm condition at the time of the incident on October 9, 2012."), attached hereto as Exhibit 12.

Based on Dr. Arndt's admissions that the Myers and Murphy reports do not actually cite to or otherwise discuss the NJCFA[10] and that he does not challenge the accuracy of Dr. Murphy's measurements, his cumulative opinions of other defense experts, his impermissible legal interpretations (*see infra*), and his opinions which are clearly non-responsive to any of Sun's experts' opinions, this Court should strike his report in its entirety. *See Blake*, 292 F.R.D. at 17 (striking expert report, in part, because it "respond[ed] to an argument that appears nowhere in the opinions of Defendant's experts"); *In re Asbestos Products Liability Litig. (No. VI)*, 2012 WL 661673, at *3 (striking expert report, in part, because it was "not merely intended to solely rebut on the same subject matter, but rather to offer additional expert evidence well beyond the scope of the Plaintiff's expert reports, including new opinions.").

      iii.    <u>Jack Osborn</u>

Mr. Osborn's report omits any mention of, or citation to, <u>any</u> of Sun's expert reports, and Mr. Osborn readily conceded that his report does not respond to the Murphy report. Osborn Dep. Tr. at 78:23-79:11 ("I do not believe I responded at all in reference to Mr. Murphy, because I was not qualified to do so."), attached hereto as Exhibit 13.  Moreover, his report discusses almost everything <u>but</u> the Fike system, as he himself acknowledges.  *See* Osborn report at 1 ("I have evaluated the new dust collection system [as opposed to the Fike system] used to vent the emissions from the #306 mixing tank, where the event occurred. The purpose was to determine what role this system played *in creating the conditions resulting in* the fire, explosion and flashfire.  This evaluation includes the development of

---

[10] It is also worth noting that while Dr. Arndt's report provides an extensive colloquy on the NJCFA and incorporates the NJCFA into several of his purported opinions, the Arndt Report does not cite to or include the NJCFA as a document upon which Dr. Arndt relied in forming his opinions.

the dust collection design parameters and specifications, subsequent system purchase and installation, and the actual performance and use of the [dust collection] system"), attached hereto as Exhibit 3 (emphasis added); Osborn Dep. Tr. at 13:4-8 (responding that he was retained "[t]o provide expert witness testimony and information regarding the dust collection system."). In particular, his report focuses on the dust collector design and the parts that go with it, all of which go well beyond the scope of any of Plaintiff's expert reports, which focus on the Fike system and its failure to suppress the deflagration, regardless of how the fire initiated or its point of origin. In other words, Dr. Myers looked at how the Fike system operated *once there was a deflagration.* (*See* Myers report at 1 ("I was retained by Morgan, Lewis & Bockius LLP to investigate the role of the Fike explosion and suppression system on the incident that occurred on October 9, 2012 . . . ."); *see* Myers Dep. Tr. at 48:25-49:24 (testifying that cause and origin were not very "important to my opinions because I looked at the performance of the explosion protection system and isolation system in general to a variety of different scenarios that could have caused this event or could have caused other events that this system should protect."); 62:23-63:9 ("the canisters did disperse suppressant, but the system did not completely extinguish and isolate the deflagration that occurred. . . . the system failed to isolate the deflagration and it allowed it to propagate through multiple portions of the dust collection system.")), attached hereto as Exhibit 14.

Mr. Osborn even acknowledged that his report only "respond[ed] *in general* to the assertions from Mr. Myers." Osborn Dep. Tr. at 79:12-13 (emphasis added). Indeed, Mr. Osborn consistently testified that the only areas of his report that even remotely addressed the Myers report were the bottom paragraph of page 8, the top paragraph of page 9, and Conclusion I on page 9. *See, e.g.*, Osborn Dep. Tr. at 84:5-14; 84:23-85:10; 91:23-92:22;

93:18-94:7; 99:20-100:11; 102:6-103:7; 104:13-105:7.  As nearly the entirety of Mr. Osborn's report contains opinions going well beyond the scope of Sun's expert reports, it should be stricken as a late affirmative report.  *See Blake*, 292 F.R.D. at 17 (striking expert report, in part, because it "respond[ed] to an argument that appears nowhere in the opinions of Defendant's experts"); *In re Asbestos Products Liability Litig. (No. VI)*, 2012 WL 661673, at *3 (striking expert report, in part, because it was "not merely intended to solely rebut on the same subject matter, but rather to offer additional expert evidence well beyond the scope of the Plaintiff's expert reports, including new opinions.").

Almost as an afterthought, Osborn also points to items 1, 2, and 3 on page iv of the Myers report as items that he ostensibly addressed "in part," but this is summary opinion based on discussions he had with Mr. Cholin, and must be stricken for that reason.  *See* Fed. R. Evid. 403; *Robert S.*, 256 F.3d at 170; *Withrow*, 967 F. Supp. 2d at 1007, n.18.

Finally, like Frank and Cholin, Mr. Osborn was also retained by Defendants over a year before he even produced his report, further belying the suggestion that his report and expert opinions were "responsive" to Sun's reports.  *See* Osborn Dep Tr. at 50:11-18 (discussing notes and handwritten report drafts dating back to July 2015, and confirming he was retained in this matter at that time.).

      iv.   <u>John Cholin</u>

The vast majority of Mr. Cholin's report should be stricken because it is an untimely affirmative report.   Nearly two-thirds of Mr. Cholin's 91-page report is devoted to reconstructing the Incident according to his theories of what occurred.  Indeed, he does not even begin to pretend to respond to Sun's expert reports until page 58 of his own report.  Furthermore, by his own admission, his report is mainly affirmative because he "was retained to perform an investigation into the event, reconstruct the process and progress of

the deflagration (explosion) and provide an analysis of and opinion(s) regarding the cause(s)." Cholin Rep. at 2. These are "not merely intended to solely rebut on the same subject matter, but rather to offer additional expert evidence well beyond the scope of the Plaintiff's expert reports, including new opinions," *In re Asbestos Products Liability Litig. (No. VI)*, 2012 WL 661673, at *3, not a response to Sun's experts. A comparison of the first two-thirds of his report with the reports of Drs. Myers and Murphy illustrates why Mr. Cholin's report is an improper affirmative report.

Page 4 of Mr. Cholin's report lists his six opinions for this case. These opinions discuss (1) his version of the cause the Incident and its event reconstruction; (2) why he believes Sun's employees caused the fire that burned them when they attempted to put out an existing fire with a fire extinguisher, but instead, per Mr. Cholin, dislodged and suspended a cloud of dust which ignited upon contact with the existing fire; and (3) that the root-cause of the Incident was poor Sun Chemical management at every level. *Id.* at 4. Specifically, he believes the fire was caused by "an electro-static potential discharge in a vapor/air mixture in the flexible duct immediately above Mixer #306" and that this electro-static discharge caused a deflagration immediately above Mixer #306. *Id.* These opinions, and any discussion on the origin of the Incident, however, must be stricken because they are improper affirmative opinions.

By Mr. Cholin's own admission, Dr. Myers' report does not make "any determination of origin, cause, process and progress of the subject deflagration event." *Id.* at 58; *see also* Cholin Dep. Tr. at 35:13-15 ("I don't recollect seeing anything where Mr. Myers makes a definitive statement regarding the process and progress of the event."), attached hereto as Exhibit 15. Although Dr. Myers does not determine the origin of the deflagration, identifying the root cause was not critical to his opinion on whether the Fike system performed as promised. *See* Myers

Dep. Tr. at 49:8-24.  Furthermore, Cholin cannot assert that his event reconstruction opinions are responsive to any part of Dr. Murphy's report, because that report deals solely with the discrete issue of whether the Fike system contained audible alarms.  Murphy Rep. at 7 ("I was asked to evaluate the auditory alarm functions of the components of the Fike explosion protection system mounted in an electrical panel in facility.").  For these reasons alone, the first fifty-eight pages of Cholin's Report do not "explain, repel, counteract, or disprove evidence of the adverse party." *Blake*, 292 F.R.D. at 17.  And just like the report in *Blake*, these sections of Cholin's Report should be stricken because they "respond to an argument that appears nowhere in the opinions of [Sun's] experts." *Id.*

The clear conclusion that the majority of Mr. Cholin's report is affirmative is accentuated by the fact that he has been assisting Defendants since October 2013, Cholin Dep. Tr. at 8:4-6, and that he included the November 2, 2015 "Affidavit of John M. Cholin" in the annex of his report.[11]  To be clear, although this affidavit, like Mr. Frank's, was prepared for the State Court Action, it is included as part of Cholin's report in *this* action.  *Id.* at 25:13-15 ("Q. Is this part of your report, the affidavit?  A.  Yes.").  This is significant because the affidavit was signed and notarized on November 2, 2015, approximately ten months before he issued his report, and *eight months before Myers and Murphy issued their reports.  Id.* at 24:20-21; 25:16-20.

Furthermore, as with Frank's affidavit, a side-by-side comparison of Mr. Cholin's August 29, 2016 report with his November 2015 affidavit clearly demonstrates the overlapping content between the two documents:

| Cholin August 29, 2016 Report | Cholin November 2015 Affidavit |
| --- | --- |

---

[11] This four page, twenty-three paragraph affidavit appears after Annex B.

| Page 73, Para. 2[12] | Paragraph 5 |
|---|---|
| Page 19, Para. 4 | Paragraph 7 |
| Page 21, Para. 4 | Paragraph 8 |
| Page 20, Para. 4; Page 21, Para. 4 | Paragraph 10 |
| Page 21, Para. 4 | Paragraph 12 |
| Page 54, Bullet 1 | Paragraph 15 |
| Page 74, Para. 1 | Paragraph 18a |
| Pages 53-54 | Paragraph 18b |
| Page 54, Bullet 9 | Paragraph 18d |
| Page 54, Para. 1 | Paragraph 21b |

The inclusion of this affidavit and the considerable overlap between his affidavit and report highlights the fact that Cholin "was always intended to testify as an *initial* expert witness for" Defendants.  *Blake*, 292 F.R.D. at 18. (emphasis added)

Additionally, in these overlapping sections, Mr. Cholin discusses (1) the OSHA General Duty Clause, Cholin Report, Pg. 73; (2) the New Jersey Uniform Construction Code, *id.* at 74; (3) SunCare 65, *id* at 21; (4) Process Hazard Analyses, *id.*; and (5) whether Sun performed an appropriate acceptance test, *id.* at 54.  His report and his affidavit's discussion of these topics underscores the fact that his report is affirmative because neither Drs. Myers' nor Murphy's reports contain any opinions discussing these topics.  Nothing in the first fifty-eight pages of Mr. Cholin's report, or in his entire affidavit, responds to Sun's expert reports, and therefore, those non-responsive portions should be stricken.

---

[12] References to paragraph numbers in this table are to the full paragraphs that appear on each page.

Finally, his report's affirmative nature is underscored by the fact that he began writing it one month before Drs. Myers or Murphy issued their expert reports.  During his deposition, Mr. Cholin initially testified that he "started writing it probably in the month of June."  Cholin Dep. Tr. at 10:21.  However, once confronted with the header of his report, which bears the date "May 25, 2016," he conceded that this was the date he commenced writing.  *Id.* at 20:18-24.  Of course, Drs. Myers and Murphy did not issue their reports until June 29, 2016, so it is impossible that Mr. Cholin was rebutting their opinions during any drafting that occurred from May 25 – June 29.

For these reasons, it is clear that the first fifty-eight pages of his report are affirmative and do not respond to any opinions in Drs. Myers' or Murphy's reports.  Therefore, this section of his report should be stricken, and he should be prevented from offering any testimony concerning (1) his event reconstruction; (2) his opinion that Sun's employees caused the fire that burned them when they used a fire extinguisher which suspended a cloud of dust; (3) his opinion that the root-cause of the Incident was Sun's poor management; and (4) any opinions contained in his attached affidavit.

      c.      **To Varying Degrees, All of Defendants' Expert Reports Impermissibly Cite to or Rely on the U.S. Chemical Safety and Hazard Investigation Board's January 2015 Report, and the Court Should Strike All Such References.**

Several of Defendants' expert reports contain citations to, and/or blanket quotations from, the CSB Report, and as Defendants well know, "[n]o part of the conclusions, findings, or recommendations of the Board relating to any accidental release or the investigation thereof shall be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in such report."  42 U.S.C. § 7412(r)(6)(G).  Sun has identified the following portions of Defendants' expert reports that cite to the CSB Report, despite the clear statutory prohibition against doing so.  *See e.g.*, Arndt Rep. at 5-7 (fn 1 and Figure 1), 22; Cholin Rep. at

5 (fn. 1-4), 10 (fn. 11), 11, (fn. 13), 12 (fn. 15-16), and 52 (fn. 281); Frank Rep. at 15 (fn. 59); Osborn Rep. at 1 ("This was confirmed both by the CSB testing (reference) . . . .").[13]

In addition, several of Defendants' experts admitted during their depositions that they had reviewed the CSB Report and incorporated information from it into their reports. *See, e.g.*, Arndt Dep. at 87:24-90:9; Frank Dep. Tr. at 172:21-173:4 ("At the time I wrote this report, I was relying on the fact statements included in the Chemical Safety Board report, not their conclusions, but their observations, their factual observations that were documented in their report.").[14]

Accordingly, Sun moves to strike all references to the CSB Report and information derived therefrom identified in the reports above.

### d.   The Arndt Report Is Replete with Improper Legal Opinions that Should Be Stricken.

Much of the Arndt report contains erroneous legal interpretations of the NJCFA and OSHA Letters of Interpretation, which invades the province of the Court. *See Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("an expert witness is prohibited from rendering a legal opinion."); *Crowley v. Chait*, 322 F. Supp. 2d 530, 550 (D.N.J. 2004) ("[I]t is impermissible for a witness to testify as to the governing law since it is the court's duty to explain the law to the jury, . . . The Court has no intention of allowing any expert in this case to usurp its rightful role to instruct the jury on the law.").

---

[13] Although Mr. Osborn refers to the CSB's findings in his report, he does not cite any CSB materials as a source he relied on in Appendix B, "Reference and Document Listing".

[14] Mr. Pund's report does not cite specifically to the CSB Report, but it cites three articles discussing the CSB's findings.  Though counsel for Defendants did provide the CSB Report to him, he did not rely on it in forming his opinions.  Pund Dep. Tr. at 70:4-12 (admitting he read the CSB Report "for background but [I] did not directly reference that in my report in any way, since I was instructed by counsel that I was not permitted to rely on the report."), attached hereto as Exhibit 16.

In his report, Dr. Arndt seeks to substitute his own interpretation of what constitutes an unlawful practice under the NJCFA, particularly in Opinion 3. Even assuming his interpretation is correct (which it is not), his personal legal interpretation is not a legitimate basis for expert opinion, particularly under the NJCFA, which ignores the intent of the advertiser in determining whether a violation has occurred. "An intent to deceive is not a prerequisite to the imposition of liability for an affirmative act." *Heyert v. Taddese*, 70 A.3d 680, 694 (N.J. App. Div. 2013) (citing *Thiedemann v. Mercedes–Benz USA*, 872 A.2d 783, 791 (N.J. 2005)) (affirming trial court's determination that "there is no scienter requirement in order to trigger liability under the Consumer Fraud Act," and "any knowledge or intent on the part of the Landlords is irrelevant for purposes of determining whether Landlords violated the Consumer Fraud Act."). Yet, in his report, Dr. Arndt focuses on the intent of the advertiser (Fike), which is entirely irrelevant for CFA purposes, and, moreover, is flawed under existing case law. *See* Arndt Rep. at 8 ("Context of the language *and intent of the sender* are of critical importance" when evaluating "language within the context of a claim, under the CFA.") (emphasis added).

Dr. Arndt goes on to state that "[t]he CFA is a performance base[d] communication regulation" and "[b]ecause the regulation is dealing with the process and not simply the output, the way in which the information is collected, organized, and presented as a system, must be a part of the examination in a scientific evaluation." *Id.*[15] There are many problems with this statement. First of all, the CFA is a statute, not a regulation. Dr. Arndt's failure to distinguish between the two raises questions as to his understanding of the CFA in the first place, especially considering that, as Dr. Arndt readily acknowledged, he is not a

---

[15] Dr. Arndt also was unable at his deposition to identify any case law classifying the NJCFA as a performance-based statute. *See* Arndt Dep. Tr. at 92:17-24.

lawyer.  *See* Arndt Dep. Tr. at 27:1-3.  Second, without citing to a stitch of legal authority supporting his interpretation of the NJCFA, he concludes that the NJCFA is concerned with the collection and organization of information that is subsequently communicated to a consumer.  Nowhere in the text of the NJCFA does the statute describe its scope as broadly as Dr. Arndt does.   Rather, the NJCFA examines whether "unlawful practices" have occurred, namely "affirmative acts, knowing omissions, and violations of regulations promulgated pursuant to the statute."  *Heyert*, 70 A.3d at 694; *see also* text of NJCFA, § 56:8-2.   Dr. Arndt tries to rationalize his analysis by describing this evaluative process as "scientific", when it is a legal interpretation of the CFA's requirements that only a court is authorized and competent to instruct a jury on.

Nor does Plaintiff need to show reliance on misleading statements to prevail on a NJCFA claim, which Dr. Arndt does not seem to understand.  *Compare Belmont Condo. Ass'n, Inc. v. Geibel,* 74 A.3d 10, 24 (N.J. App. Div. 2013) ("A plaintiff need not even show reliance on the violation of the [CFA] as long as an ascertainable loss resulting from defendant's conduct is demonstrated."); *with* Arndt Rep. at 17 ("there is no scientific support for a conclusion that Fike would assume that potential buyers of their equipment could in any way rely on the materials in such a way that they would be misled, deceived or damaged by the language used."); Arndt Dep. Tr. 173:3-6 ("the materials in the brochures cannot be the sole source of their understanding of the implementation of these systems."). At the very least, these present entirely new opinions, underscoring their affirmative nature.

Dr. Arndt also states in his report that "OSHA has stated in letters of interpretation that employers <u>cannot rely</u> on equipment manufacturers for the safety of employees."  Arndt Rep. at 19 (emphasis added).  Not only does Mr. Arndt fail to actually cite to any such letters of

interpretation in his report, Defendants supplied the so-called authority to Sun the day *after* Arndt's September 27, 2016 deposition, and, not surprisingly, the letters of interpretation say no such thing. Here, too, Dr. Arndt is providing a legal interpretation, not expert analysis within his field of expertise, which is impermissible.

Indeed, of the four letters of interpretation Defendants supplied to Sun, only one has any potential connection to Dr. Arndt's extreme statement,[16] and it deals with OSHA's machine-guarding standards, which are not at issue in this case. In pertinent part, it states:

> Your letter indicates that machines destined for Europe, have safeguarding on the infeed and outfeed conveyor access points, while ones sold in the United States have no safeguarding or severely inaccurate safeguarding. OSHA standards do, in fact, require the same stringent guarding on packaging and pelletizing machines as the European community. In the United States, however, machines such as packaging and pelletizing machines are sometimes sold either with or without safeguards. Under current OSHA regulations, it is the responsibility of the employer who uses the machines to ensure that packaging and pelletizing machines and all other machines comply with the general machine guarding requirements in §1910.212(a)(1). If a machine is sold without guards, the employer who purchases the equipment must provide adequate guarding to comply with applicable OSHA standards, (e.g. 1910.212).

OSHA Letter of Interpretation to Paul Budesheim (Dec. 8, 1999). This letter does not forbid an employer from relying on representations of a manufacturer that a product/machine complies with applicable safety requirements, including OSHA regulations. In addition, the machine guarding standard is, in fact, a "performance standard," meaning there is no singled prescribed method to protect employees. *Main Tubular Prod., Inc.*, 1980 O.S.H. Dec. (CCH) ¶ 24,668 n.5 (O.S.H.R.C. A.L.J. July 18, 1980) ("A performance standard states the results required rather

---

[16] The other three letters of interpretation address fire equipment training requirements (including OSHA's preference that employers evacuate employees upon the sounding of a fire alarm – which Sun requires), the use of fire brigades and portable fire equipment, and OSHA's requirement that fire prevention plans be in written form, none of which have any bearing on Mr. Arndt's blanket statements and or contain any prohibition against relying on the expertise of equipment manufacturers to protect employee safety.

27

than specifying that a particular type of guard must be used.  It gives an employer latitude in selecting a means of compliance which is best suited to its operation.").

Moreover, OSHA letters of interpretation do not have the force of law, as they are neither statutes nor regulations.  *Bd. of Trustees of Bricklayers and Allied Craftsmen Local 6 v. Wettlin Assocs., Inc.*, 237 F.3d 270, 274 (3d Cir. 2001) ("agency interpretations are not binding on us.") (citing *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.")).  So, even if Mr. Arndt's application were correct (which it is not), the letters of interpretation would not be binding on this Court.  Finally, OSHA did not issue a citation to Sun related to these machine-guarding standards, or, for that matter, any of the other items addressed in the other OSHA guidance documents belatedly identified by Arndt, so the standard is completely irrelevant to the issues in this case.

Through Dr. Arndt, Defendants attempt to establish what the CFA means and misapply OSHA's letters of interpretation to Sun, when "it is the court's duty to explain the law to the jury, . . ." *Crowley*, 322 F. Supp. 2d at 550.  The Court should not permit Defendants "to usurp its rightful role to instruct the jury on the law," (*id*.) and should strike all portions of Dr. Arndt's report containing improper legal interpretations of the NJCFA and the OSHA letters of interpretation belatedly produced by Dr. Arndt.  In addition, because the rest of Dr. Arndt's report is premised on his incorrect interpretation of the NJCFA, the Arndt report should be stricken in its entirety.

### e.    The Pund Report Improperly Summarizes Several Depositions

Large sections of the Pund report merely "summarize the facts and depositions of others," which usurps the jury's function and would not aid the jury in its fact-finding inquiry beyond what an attorney could offer.

> Likewise, neither Johnson nor any other witness will be permitted to simply summarize the facts and the depositions of others. Such testimony comes "dangerously close to usurping the jury's function" and "implicates Rule 403 as a 'needless presentation of cumulative evidence' and 'a waste of time.'" *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003); *see also Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) ("Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument."); *SEC v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.").

*Crowley*, 322 F. Supp. 2d at 553-54.  Indeed, the Pund report contains extensive (and irrelevant) summaries (as paraphrased by Pund) of the deposition testimony of Eddie Caddell and Keith Roberts, constituting nearly one-third of his entire report.  (*See* Pund Rep. at 3-4 and 6-7).  It is clear from Mr. Pund's own deposition testimony that the deposition testimony of Eddie Caddell, cited in support of his arguments concerning Sun's "'sanctioned' lack of proper policies and procedures," was largely irrelevant in forming his actual opinions, which relate to the costs Sun incurred as a result of the incident.  *See* Pund Dep. Tr. at 129:15-131:15 (acknowledging that the OSHA citation contained none of the items Mr. Pund listed in his report from Eddie Caddell's testimony).  Similarly, his citation of Keith Roberts' testimony serves virtually no purpose at all, other than to comprise the entirety of Pund's mention of "other issues."  *See* Pund Dep. Tr. at 144:24-150:19 (referring to Keith Roberts only to bolster his criticism of Mr. Dovell "failure" to challenge Sun's damages rather than to point to any particular error in Mr. Dovell's report).  Accordingly,

these sections of the Pund report are a "needless presentation of cumulative evidence" and should be stricken from his report.

>    **f.**  **Defendants' Eleventh-Hour Document Dumps Also Prejudiced Sun and Severely Hampered Its Ability to Depose Defendants' Experts**

In addition, Defendants failed to comply with the Notices of Deposition that Sun served on September 9, 2016, each of which explicitly demanded that the documents requested within each notice (primarily documents relied upon or cited in Defendants' experts' reports but not previously produced) be produced "no later than one week prior to the date noticed for [each] deposition."   *See* Notices of Deposition, attached hereto as Exhibit 17.   Instead, Defendants produced voluminous documents from Messrs. Arndt, Cholin, and Osborn mere days before the respective experts' depositions.[17]   The Osborn documents were particularly egregious, as Defendants dumped a total of 4,744 pages of material on Sun over the two days before the deposition, including dozens of pages of handwritten calculations in cramped and miniscule print, leaving virtually no time for Sun to review and evaluate those documents.   *See* Exhibit 18 attached hereto.   Even Osborn himself acknowledged, when presented with those documents in his deposition, "it's going to take a while to go through some of this."   Osborn Dep. Tr. at 49:16-17.   Dr. Arndt, moreover, produced multiple pages of notes at the deposition itself, as well as additional documents *relied upon in his report after* his deposition. *See* September 28, 2016 E-mail from Sue Turpin, Counsel for Defendants, attached hereto as Exhibit 19; *see also* Arndt Tr. at 208:24-210:7 (discussing Dr. Arndt's failure to provide the OSHA letters of interpretation upon which he relies).   A summary of these productions follows below.

---

[17] Sun anticipates that Defendants will claim, in turn, that Sun also produced documents shortly before the depositions of its experts.   The difference here, however, is that Fike's notices requested copies of the experts' working files *at the deposition itself,* whereas Sun expressly requested that the requested documents be produced *no less than one week in advance.*

| Expert | Date of Deposition | Date of Production[18] | Description |
|---|---|---|---|
| Arndt | September 27, 2016 | September 23, 2016; September 28, 2016 | 3,849 pages of documents; 8 pages of documents |
| Cholin | September 26, 2016 | September 23, 2016 | 493 photographs and 135 pages of documents |
| Frank | September 28, 2016 | None | N/A |
| Osborn | September 22, 2016 | September 20, 2016; September 21, 2016 | 3,537 photographs and 671 pages of documents; 536 pages of documents, including handwritten calculations (4,744 pages total) |
| Pund | September 23, 2016 | September 20, 2016 | 21 pages of documents |

Given the number of Defendants' expert reports propounded on Sun (five vs. three), Sun's disadvantage in having half the time provided to Defendants' time to review and evaluate expert reports (the majority of which introduced wholly new issues, opinions and evidence), and the voluminous material Defendants dumped on Sun immediately before their expert depositions in a tightly compacted time frame (*i.e.*, five depositions over the course of five consecutive business days), it is difficult to imagine how Sun could have been more prejudiced going into Defendants' expert depositions.

g.   **Defendants Willfully Violated this Court's May 5, 2016 Order, Continuing Their Pattern of Dilatory and Non-Compliant Behavior Throughout the Pendency of Litigation**

Not only has Plaintiff demonstrated ample prejudice caused by Defendants' tender of four late affirmative expert reports (excluding the Pund report, which, unlike the other four

---

[18] These dates exclude September 12, 2016, when Defendants provided information on Messrs. Cholin's, Frank's, and Osborn's testimony for the preceding four (4) years –information that should have been included with their reports - and September 13, 2016, when Defendants provided information on Dr. Arndt's prior testimony, as required by Fed. R. Civ. P. 26(a)(2)(B)(v). Defendants also produced a revised curriculum vitae for Mr. Osborn the day before his deposition, which Sun also excludes from the table.

reports, is arguably a responding report) and 11th-hour productions of thousands of pages of documents on Plaintiff, Defendants' ambush of Plaintiff with four late reports is symptomatic of the "bad faith or wilfulness in failing to comply with a court order or discovery obligation" that Defendants have displayed throughout the course of this litigation, and this Court should not condone Defendants' continued bad behavior.  The *Blake* case is particularly instructive on this point:

> Because Garmoe's report cannot be considered a rebuttal report, Plaintiff's belated disclosure is not permitted under Fed. R. Civ. P. 26(a)(2)(D)(ii). Instead, Garmoe's report must be considered an untimely and improperly disclosed initial expert report in violation of Rule 26(a)(2), subjecting Plaintiff to sanctions under Rule 37(c)(1). The overwhelming weight of authority is that preclusion is required and mandatory absent some unusual or extenuating circumstances—that is, a substantial justification.

*Blake*, 292 F.R.D. at 18-19 ("In sum, the Court agrees with Defendant's characterization that Plaintiff's rebuttal report is "a thinly veiled attempt to circumvent his failure to timely disclose Dr. Garmoe as a testifying expert, . . . ") (internal citations and quotation marks omitted).   Defendants can advance no substantial justification for their late expert disclosures, much like they were hard-pressed to demonstrate "excusable neglect" when they untimely moved for an extension of time to file their Answer.  (*See* May 8, 2015 Sun Letter to Judge Salas (Dkt. 82)).

The Court should not reward Defendants for their repeated dilatory conduct, which Defendants have displayed from the outset of this litigation.  *See, e.g.*, November 24, 2014 Sun Letter to Magistrate Judge Clark (Dkt. 59) (listing Defendants' dilatory discovery habits); December 17, 2014 Sun Letter to Magistrate Judge Clark (Dkt. 62) (requesting leave to file a motion to compel); May 8, 2015 Sun Letter to Judge Salas (Dkt. 82) (describing Defendants' late Rule 7.1 Corporate Disclosure Statement filing, late request for an

extension of time to file an Answer, Orders striking over-long briefs and improper Amended Motion to Dismiss, and late and incomplete discovery responses), June 4, 2015 Sun Letter to Magistrate Judge Dickson (Dkt. 90) (describing current status of outstanding discovery from Defendants after the fact discovery deadline had passed), and March 11, 2016 Sun Status Report to Judge Vazquez (Dkt. 116) (providing history of Defendants' non-compliance with the Court's various scheduling orders, despite two extensions of the discovery deadlines). This has not been limited to timeliness, however, but also extends to repeated failure to comply with the basic procedural rules of this Court – including with the submission of the very expert reports discussed here.  *See* Exhibit 20 (August 29, 2016 letter of Suzanne Turpin transmitting expert reports, citing to NJ state law, and characterizing them as supplemental interrogatory responses); *see also* Dkt. 14 (January 16, 2014 letter from Sun to Judge Hochberg concerning Defendants' over-long reply brief, and identifying additional failures to comply with federal and local court rules).

Because the entirety of the Arndt, Frank, and Osborn reports and the majority of the Cholin report are "thinly veiled attempt[s] to circumvent [Defendants'] failure to timely disclose [these experts] as a testifying expert," they should be stricken as untimely initial expert reports that were untimely propounded on Plaintiffs with no substantial justification. *See Blake*, 292 F.R.D. at 18-19

       **h.**    **Granting Sun Additional Time to Depose Defendants' Experts Will Not Cure the Prejudice to Sun If Defendants Are Permitted to Proceed With Their New Theories at Trial, and Allowing the Evidence Would Disrupt the Orderly and Efficient Trial of the Case**

The option of granting additional time for Plaintiff to cure Defendants' failure (once again) to conform to the Court's Scheduling Order ultimately punishes Sun, by requiring it to respond to clearly out-of-scope reports and yet again delaying the ultimate resolution of

33

this case.  Sun urges this Court to enforce the deadlines once and for all.  Only then will Defendants learn to take this Court's deadlines seriously and respect its Scheduling Orders.

Allowing Defendants to present all four affirmative experts at trial would disrupt the orderly and efficient trial of the case by introducing a panoply of new and irrelevant theories designed to confuse and distract the jury from the only question in this case: did Defendants mislead Sun regarding the capability of the Fike system, thereby causing Sun an ascertainable loss?

Finally, the reports that Sun moves to exclude are of no importance to *this* litigation. *See Reckitt Benkiser*, 2011 WL 6722707, at *6.  While they may have some meaning in the related state court products liability litigation (which is likely why Defendants are using this litigation as a test run), they are of no use to answering the question of whether Defendants violated the NJCFA.

III.   **CONCLUSION**

The Frank, Arndt, and Osborn reports, as well as the majority of the Cholin report, are affirmative, rather than responsive, reports, and as such, they were served two months late; Plaintiff was prejudiced by having to prepare for and depose these four experts who espoused entirely new theories of Defendants' non-liability, wolly ignoring under Plaintiff's sole claim under the NJCFA.  These expert reports were entirely unresponsive to Plaintiff's reports, and Defendants compounded the prejudice to Plaintiff by failing to comply with Sun's Notices of Deposition and dumping significant quantities of new documents on Sun a day or two before each deposition instead of one week, as set forth in the Notices.

Each expert report also relied on the CSB Report and its associated findings, conclusions and recommendations, which is prohibited by law.  Accordingly, Sun requests that all such references be stricken.  Finally, Sun moves to strike the Arndt report on the

additional basis that it contains improper legal opinions that usurp the Court's role in instructing the jury on the law and the Pund report because it contains improper summaries of two depositions that invade the fact-finding province of the jury.

Defendants' continued, deliberate failure to comply with the basic requirements of the federal and local rules should not be condoned by this Court, and Sun respectfully requests that the Court grant its motion to strike in part or in whole the improper and untimely expert reports of Arndt, Cholin, Frank, Osborn, and Pund, as further set forth herein.

Dated: December 9, 2016

MORGAN, LEWIS & BOCKIUS LLP

*/s/ Stephanie R. Feingold*

John McGahren
Stephanie R. Feingold
502 Carnegie Center
Princeton, NJ 08540
Tel: +1.609.919.6600
Fax: +1.609.919.6701
john.mcgahren@morganlewis.com
stephanie.feingold@morganlewis.com
*Attorneys for Plaintiff Sun Chemical Corporation*