**MORGAN, LEWIS & BOCKIUS LLP**
(*A Pennsylvania Limited Liability Partnership*)
John McGahren
Stephanie Feingold
502 Carnegie Center
Princeton, NJ  08540
Tel:  609-919-6600
Fax:  609-919-6701
*Attorneys for Plaintiff Sun Chemical Corp.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUN CHEMICAL CORPORATION,<br><br>          Plaintiff,<br><br>     v.<br><br>FIKE CORPORATION AND<br>SUPPRESSION SYSTEMS<br>INCORPORATED,<br><br>          Defendants. | Civil Action No.: 2:13-CV-4069 (JMV) (MF)<br><br><br>**MEMORANDUM OF LAW IN SUPPORT<br>OF PLAINTIFF'S MOTION TO EXCLUDE<br>THE OPINIONS OF STEVE ARNDT**<br><br>**Motion Return Date: January 3, 2017** |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................. 1

II.   LEGAL ARGUMENT ......................................................................................... 2

      a.    Standard of Review .................................................................................. 2

      b.    Steve Arndt's Report and Testimony Should Be Excluded ...................... 3

            i.    Dr. Arndt Lacks the Engineering Qualifications Necessary to Support
                  Opinion 1 and Improperly Opines on an Ultimate Issue ................................... 4

            ii.   The Court Should Exclude Opinion 2 Because It Does Not Fit the Facts
                  of This Case and Is Irrelevant and Unhelpful to the Jury ................................. 7

            iii.  The Court Should Exclude Opinion 4 As Unreliable Because it Is Based
                  on Incomplete Facts and Is the Product of Flawed Methodology ...................... 9

III.  CONCLUSION .................................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aloe Coal Co. v. Clark Equip. Co.*,
    816 F.2d 110 (3d Cir. 1987) ..................................................................................4

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ..........................................................................................10

*Crowley v. Chait*,
    322 F. Supp. 2d 530 (D.N.J. 2004) .................................................10, 13, 15, 18

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ...................................................................................*passim*

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000) ..................................................................................2

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ..............................................................................7, 10, 13

*Heller v. Shaw Indus., Inc.*,
    167 F.3d 146 (3d Cir. 1999) ........................................................................10, 18

*Heyert v. Taddese*,
    70 A.3d 680 (N.J. App. Div. 2013) .......................................................................8

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ..........................................................................................10

*Lieberson v. Johnson & Johnson Consumer Cos., Inc.*,
    865 F. Supp. 2d 529 (D.N.J. 2011) ...................................................................3, 8

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000) ...............................................................................13

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ............................................................................3, 10

*Surace v. Caterpillar, Inc.*,
    111 F.3d 1039 (3d Cir. 1997) .............................................................................4, 6

*In re TMI Litig.*,
    193 F.3d 613 (3d. Cir. 1999) ...........................................................................7, 10

*Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*,
    655 A.2d 417 (N.J. 1995) .....................................................................................8

*United States v. Barile,*
   286 F.3d 749 (4th Cir. 2002) ................................................................................6

*United States v. Davis,*
   397 F.3d 173 (3d Cir. 2005) ...............................................................................10

*United States v. Ford,*
   481 F. 3d 215 (3d Cir. 2007) ...............................................................................7

*United States v. Schiff,*
   602 F.3d 152 (3d Cir. 2010) .............................................................................2, 7

*ZF Meritor, LLC v. Eaton Corp.,*
   696 F.3d 254 (3d Cir. 2012) ...................................................................10, 15, 18

**Statutes**

New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.* ...............1, 3, 8, 19

**Other Authorities**

Fed. R. Evid. 401 ................................................................................................7

Fed. R. Evid. 701 ................................................................................................6

Fed. R. Evid. 702 .........................................................................................*passim*

Fed. R. Evid. 703 ...............................................................................10, 13, 15, 18

Fed. R. Evid. 704 ................................................................................................6

*Weinstein's Federal Evidence*, § 704.03 .................................................................6

Pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), Plaintiff Sun Chemical Corporation ("Sun") moves to exclude the Expert Report and Testimony of Steve Arndt ("Arndt"),[1] proposed expert for Defendants Fike Corporation and Suppressions Systems, Inc. (collectively, "Defendants").

## I.    <u>INTRODUCTION</u>

On October 9, 2012, an explosion rocked Sun's US Ink facility in East Rutherford, New Jersey, sparking a fire that injured seven workers and shut down Sun's black ink manufacturing operations at that facility (the "Incident"); those operations remain shuttered to this day.  Less than nine days earlier, Suppression Systems, Inc. ("SSI") had completed the connection, check-out, and arming of a new Fike explosion protection system in the East Rutherford facility, for the express purpose of suppressing and isolating explosions within the dust collection system.  Sun had purchased the Fike system a few months earlier, based on representations from Fike Corporation ("Fike") and SSI concerning the protection the system would provide.  Those representations proved to be misleading and false, and, as a result, Sun has incurred millions of dollars in damages.

On July 1, 2013, Sun filed this action against Defendants, asserting a single claim under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq*. ("NJCFA"), alleging that the Fike explosion suppression and isolation system it purchased ("Fike system") following multiple meetings with, and representations from, Defendants' representatives, did not perform as promised by Defendants.  In accordance with this Court's Order of May 5, 2016 (the "Scheduling Order") (Dkt. 119), Sun timely and properly served on Defendants affirmative reports from three experts in support of its claim: (1) Dr. Timothy Myers, who opined that the Fike system did not conform to the representations made by

---

[1] *See* Arndt Rep., attached hereto as Exhibit 1.

Fike, (2) Dr. Patrick Murphy, who concluded that the alarms within the Fike system were not audible to Sun employees, even though Defendants represented that the Fike system complied with certain specified standards and certifications, including those requiring audible alarms, and (3) Raymond Dovell, CPA, who opined on Sun's damages as a result of the Incident.

Defendants have put forward a human factors specialist to opine on issues ranging from interpretation of the CFA to electrical engineering questions to inherently contradictory views on warnings and employee training. In addition to the arguments Sun sets forth in its accompanying Motion to Strike, this Court should exclude the report and testimony of Dr. Arndt because he is not qualified to render many of the opinions contained within his report, he engaged in unsound methodology and/or relied on incomplete facts to reach his conclusions, and his opinions utterly fail to fit the facts of this case.

## II.   <u>LEGAL ARGUMENT</u>

### a.   <u>Standard of Review</u>

The Court performs a "rigorous gatekeeping function" when determining the admissibility of expert testimony. *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000). Expert testimony is inadmissible under Federal Rule of Evidence 702 unless it is both relevant and reliable. *Daubert*, 509 U.S. at 589; *see also* Fed. R. Evid. 702. Indeed, Rule 702 "has three major requirements: (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge, *i.e.*, reliability; and (3) the expert's testimony must assist the trier of fact, *i.e.*, fit." *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010). Without satisfying all "three distinct substantive restrictions," of "qualifications, reliability, and fit," expert testimony is inadmissible. *Elcock*, 233 F.3d at 741. In addition, the proponent of expert

testimony must establish the admissibility of the expert's opinion by a preponderance of the evidence.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

>   **b.**   <u>**Steve Arndt's Report and Testimony Should Be Excluded**</u>

Dr. Arndt is a "human factors" expert, which he defines as "the study of the capabilities and limitations of people as they interact with systems, organizations, technology, other people, and information and environment."  Arndt Dep. Tr. at 26:6-10, attached hereto as Exhibit 2.  Although Dr. Arndt describes his field in broad terms, the particular literature he cites in his report is limited to how people perceive and respond to written warning labels on products.  Dr. Arndt opines on several areas outside of the scope of his expert training and experience as a human factors expert, including whether the alarm within the Fike system was FM-compliant (Opinion 1), which necessitates an understanding of National Fire Protection Association ("NFPA") standards and the Factory Mutual ("FM") certification process, as well as the engineering functions involved.  He also opines that the "descriptions of the expected performance of the" Fike system in marketing and promotion materials "were factually accurate" (Opinion 2), in part, based on his retrospective analysis and broad assumptions, such as that Sun and Defendants both understood terms like "system failure" to mean the same thing, when clearly Defendants had a very different understanding than did Sun.  Dr. Arndt's opinion on what Defendants believed "system failure" meant is irrelevant and unhelpful to the jury in a NJCFA action, which focuses on what the *consumer* understands, rather than the advertiser's or Dr. Arndt's own subjective interpretation of Fike's marketing materials.  Finally, he opines that "[a]dditional or alternative warnings and/or instructions from Fike/SSI would not have altered the behaviors of" Sun employees (Opinion 4), an opinion that relies on a set of very incomplete facts and does not fit the facts

of this case, as *written* warnings are distinct from *audible* alarms and in-person training. Accordingly, this Court should find Dr. Arndt's Opinions 1, 2, and 4 are inadmissible.

> i.   Dr. Arndt Lacks the Engineering Qualifications Necessary to Support Opinion 1 and Improperly Opines on an Ultimate Issue

Dr. Arndt is not qualified to render Opinion 1 ("The Fike suppression and isolation equipment had an FM compliant and functioning audible alarm at the time it was installed and at the time of the incident."), an engineering opinion that goes beyond the scope of his expertise as a "human factors" expert.  An expert may be excluded when his training and experience is lacking in the particular area in which his testimony is offered.  *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1055 (3d Cir. 1997) (affirming exclusion of electrical and mechanical engineering expert because he had no training in "habituation" and no experience in designing equipment from a human safety standpoint); *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987) (finding that the district court abused its discretion by allowing a salesman to testify about the cause of an equipment fire).

As a human factors expert, Dr. Arndt is not qualified to opine that NFPA 69 and 72 apply to building-wide alarms (*see* Arndt Rep. at 12-13, Opinion 1) and not to the Fike system, contrary to Dr. Murphy's opinion that these standards do apply.  Dr. Arndt acknowledged at his deposition that he is an NFPA member solely to access the website and materials (*i.e.*, standards) on it, and is not an active member of the NFPA.  *See* Arndt Dep. Tr. at 39:7-18.  He also could not recall having reviewed NFPA 69 prior to this case, Arndt Dep. Tr. at 101:24-102:10, and he acknowledged never having applied NFPA 72 in an engineering capacity, *id*. at 127:17-128:2.  Nor could Dr. Arndt recall what the training requirements are in NFPA 69 or 654.  *See id*. 150:18-151:5.  Dr. Arndt also acknowledged that he does not have a background in acoustical engineering.  Arndt Dep. Tr. at 136:23-

4

137:14.   Therefore, he does not possess the engineering qualifications necessary to give Opinion 1 ("The Fike suppression and isolation equipment had an FM compliant and functioning[2] audible alarm at the time it was installed and at the time of the incident."), which is based on an understanding of the applications of NFPA 69 and 72, particularly when he admits that he does not challenge the accuracy of Dr. Murphy's sound measurements.  *See* Arndt Dep. Tr. at 135:8-14.

Moreover, Dr. Arndt's conclusion that the alarm within the Fike system was FM-compliant relies primarily on FM's certification that the alarm met FM standards *before* the Fike system was installed at the US Ink facility, a circular argument.  *See* Arndt Rep. at 13 ("It is FM who wrote the performance specification for compliance, it is FM who conducted the testing on the control panels, it is FM that produced reports stating that the panels met FM requirements for audible alarms, and it is FM that determines what the definition of audible alarm is in the context of their certification.").  Even assuming that one needs an expert to opine that a system is FM compliant simply because it was *certified* at some point by FM, notably absent in Dr. Arndt's analysis is whether the Fike system *remained* FM-compliant after it was placed (at Fike's recommendation) in an enclosure that muted the audibility of the alarm at Sun's US Ink facility, which Dr. Murphy's opinion addresses.

Indeed, Dr. Murphy goes deeper than the FM certification itself and analyzes the requirements of NFPA 69 ("Explosion Prevention System" standard) and FM 5700 ("Approval Standard for Explosion Protection Systems" standard) and interprets those standards through the lens of NFPA 72 ("National Fire Alarm Code") and ISO 7731

---

[2] Dr. Murphy does not claim that the alarm failed to function; his opinion is that it was not actually audible to Sun employees, in part, because "the placement of the Fike system in a Fike-specified enclosure effectively negated the audible alarm function."  Murphy Rep. at 8, attached hereto as Exhibit 3.

5

("international standard for auditory danger signals").  *See* Murphy Rep. at 19-25.  Because Dr. Arndt is not an expert on NFPA standards or an electrical engineer who regularly uses these standards in his day-to-day work, it is unsurprising that he omits any analysis of his own on the standards on which the FM certification was based and instead declares by fiat that the Fike system was FM-compliant because at one point in time, and under very specific testing conditions, FM certified that it was.  Dr. Arndt is grossly underqualified to opine on whether the Fike system, at the time (and in the manner) it was installed at Sun's US Ink facility, was FM-compliant, and his Opinion 1 should be excluded accordingly.  *See Surace*, 111 F.3d at 1055.

The Court should exclude Opinion 1 for the additional reason that it improperly opines on an ultimate issue for the jury to decide.  "Although opinion testimony, whether offered by a lay witness pursuant to Fed. R. Evid. 701, or by an expert pursuant to Fed. R. Evid. 702, is not inadmissible simply 'because it embraces an ultimate issues to be decided by the trier of fact,' Fed. R. Evid. 704, it is not properly received 'merely [to] tell the jury what result to reach,' *id.*, Advisory Committee Notes on 1972 Proposed Rules.  The ultimate issue in this case is whether the Fike system performed as promised to Sun, which necessarily includes whether it complied with applicable standards related to audible alarms. Dr. Arndt simply telling the jury that the Fike system so complied, without engaging in any meaningful analysis, runs contrary to the spirit of Fed. R. Evid. 702 and is unhelpful to the jury.  *See United States v. Barile*, 286 F.3d 749, 760-761 (4th Cir. 2002) (trial court has discretion to exclude expert testimony concerning ultimate issue if all it does is tell finder of fact what conclusion to reach); *see also* Weinstein's Federal Evidence, Section 704.03 ("the

testimony must meet the criterion of helpfulness imposed by Rules 701 and 702 on both lay and expert witnesses.").  Accordingly, the Court should exclude Dr. Arndt's Opinion 1.

ii.    <u>The Court Should Exclude Opinion 2 Because It Does Not Fit the Facts of This Case and Is Irrelevant and Unhelpful to the Jury</u>

Dr. Arndt's discussion of "system" and "system failures" in support of Opinion 2 is irrelevant to this case and should be excluded.   The relevance "requirement should be evaluated under the standard expressed in Rule 401."  *United States v. Ford*, 481 F. 3d 215, 218 (3d Cir. 2007); *see also Schiff*, 602 F.3d at 177 ("expert testimony needs to speak clearly and directly to an issue in dispute in the case, and not mislead the jury, so that district courts should tread carefully when evaluating proffered expert testimony, paying special attention to the relevance prong of *Daubert*") (quoting *United States v. Ford*, 481 F.3d 215, 220, n.6 (3d Cir. 2007) (internal quotations omitted).

To assess whether an expert's proposed testimony is relevant, the Court determines "whether the expert testimony proffered is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id*. at 173 (internal citations and quotations omitted); *see also In re TMI Litig.*, 193 F.3d 613, 670 (3d. Cir. 1999) ("expert evidence which does not relate to an issue in the case is not helpful") (affirming district court's exclusion of testimony because the "assumption [was] supported by nothing other than conjecture, . . .").

The parties disagree on the meaning of "system failure" as used in Fike's marketing materials attesting that Fike systems had never experienced a "system failure" in the field. Dr. Arndt interprets the phrase through the lens of "Signal Detection Theory" ("SDT") without explaining how *Sun* interpreted or otherwise understood the term "system failure" or *why* Sun should (or would) have utilized SDT.  *See* Arndt Rep. at 15-17.  We have only his

7

say-so that "system failure" actually means a "miss" under SDT (*i.e.*, "incorrectly not detecting an explosion when one is present or failing to activate suppression/isolation when an explosion is present") (*see* Arndt Rep. at 16), and that both parties understood (or should have understood) it to mean "miss," rather than a "false alarm" or something else.  *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Under the NJCFA, the correct standard is not what a particular phrase in marketing or promotion materials means *under SDT*, nor what the *advertiser* meant to convey, but rather, what the *recipient* of the communications understood.  *See Heyert v. Taddese*, 70 A.3d 680, 694 (N.J. App. Div. 2013) ("An intent to deceive is not a prerequisite to the imposition of liability for an affirmative act" under the NJCFA); *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 655 A.2d 417 (N.J. 1995) (holding that to constitute consumer fraud, "the business practice in question must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer").  Dr. Arndt then cites to Scott Rockwell's deposition testimony to support his conclusion, though he acknowledged at his deposition that Mr. Rockwell, a Fike engineer, was not a 30(b)(6) witness for either Fike or SSI (Arndt Dep. Tr. at 152:16-153:22), so his testimony was not made on behalf of Defendants per se, but rather in his capacity as an individual Fike employee (not to mention one with information that the average consumer would not necessarily have).  Dr. Arndt's post-hoc discourse on the meaning of "system failure" is irrelevant to how *Sun* actually interpreted "system failure" at the time it purchased the Fike system and so should be excluded as not fitting the facts of the case.

8

This very specific *factual* statement that Fike explosion protection systems have "never experienced a system failure in the field" cannot be explained away by SDT or minimized as mere puffery.  *See Lieberson v. Johnson & Johnson Consumer Cos., Inc.*, 865 F. Supp. 2d 529, 540 (D.N.J. 2011) ("The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions.") (listing examples of advertising that constitute mere puffery under the NJCFA, including the slogan, "You're in good hands with Allstate").  Fike misrepresented the performance history of its explosion suppression and isolation systems to Sun and is now attempting to retroactively explain that Sun knew it did not mean what it said, an argument this Court should dismiss out of hand.

Dr. Arndt's opinion is also undermined by *Fike's own documents,* which show that system failures *had* occurred in the field, and Fike referred to them as "failures," as Dr. Myers highlights in his report and which Dr. Arndt fails to rebut.  *See* Myers Rep. at 7-8 ("These failures include systems inadvertently firing when no deflagration occurred, and in other cases armed suppression containers failing to fire when triggered. These Fike documents also contain minutes from meetings and studies performed by Fike to address system failures."), attached hereto as Exhibit 4.  For all of the foregoing reasons, the Court should exclude Opinion 2 from reaching the jury.

iii.   The Court Should Exclude Opinion 4 As Unreliable Because it Is Based on Incomplete Facts and Is the Product of Flawed Methodology

Dr. Arndt also fails to consider several relevant facts in reaching his conclusions in Opinion 4, which states, "[a]dditional or alternative warnings and/or instructions from Fike/SSI would not have altered the behaviors of US Ink employees, nor should instructions associated with response to a fire or explosion outside of the dust collector have come from

Fike or SSI." Further, Dr. Arndt treats on-product written warnings/labels as if they were the same as audible alarms and substantive in-person training, even though the literature on which he relies distinguishes between the two. *See* Arndt Dep. Tr. at 196:9-21; 197:9-198:5. These omissions and assumptions render Opinion 4 unreliable, warranting exclusion by this Court.

An "expert's opinion must be based on the 'methods and procedures of science'[3] rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief." *Paoli*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590). The Supreme Court has emphasized that

> nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

It is clear that Dr. Arndt relies on incomplete facts [cherry-picked by counsel] to reach his conclusions in Opinion 4. "The information upon which an expert bases his testimony must be reliable, and the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703, which, in addition to Rule 702, must be considered by a court for *Daubert* purposes." *Crowley v. Chait*, 322 F. Supp. 2d 530, 542 (D.N.J. 2004) (citing *In re TMI Litig.*, 193 F.3d at 697). "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012) (citing *Brooke Grp. Ltd.*

---

[3] *See United States v. Davis*, 397 F.3d 173, 178 (3d Cir. 2005) ("In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court . . . expanded *Daubert's* general holding to apply to expert testimony based on "technical or other specialized knowledge.").

*v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).   "[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999).

First, warning labels are *not* the same as audible alarms, despite Arndt's half-hearted claims at his deposition that they are.  *See* Arndt Dep. Tr. at 197:9-23 (testifying that the papers cited in footnotes 8-11 "can all be applied to auditory, visual, tactile warnings. . . . I believe that there are sections of all of those that *could be* applied to audible alarms.") (emphasis added).   Arndt cites to four publications in support of Opinion 4 (*see* Arndt Rep. at 19. n.8-11), all of which apply to written warning labels, *not* auditory alarms.  *See* McCarthy, R. L., Finnegan, J. P., Krumm-Scott, S., & McCarthy, G. E., "Product Information Presentation, User Behavior, and Safety In Human Factors Society," at 84 (1984) ("In the face of evidence that *warning labels* do not positively impact safety, *use of on-product warning labels must be judged at best an ineffective safety measure* and potentially a misallocation of safety resources.") (emphasis added) (not mentioning the words "audible" or "alarm" even once), attached hereto as Exhibit 5; Ayres, T.J., Gross, M.M., Wood, C.T., Horst, D.P., Beyer, R.R., Robinson, J. N., "What is a warning and when will it work," Human Factors Perspectives on Warnings, at 428 (1994) ("*On-Product Warning Labels*: The user of a consumer product is unlikely to be seeking information, *and is likely to filter out a warning label*.") (emphases added) (mentioning audible alarms only once: "*Even a dynamic warning*, such as the audible backing-up alarm on a mining vehicle, can lose its value through habituation simply because it is presented so frequently"), attached hereto as Exhibit 6;  Arndt, S. R., Ayres, T. J., McCarthy, R. L., Schmidt, R. A., Wood, C. T., & Young, D.

E., "Warning Labels and Accident Data," Proceedings of the Human Factors and Ergonomics Society, 550 (1998) ("Together with previous studies, these [analytical] results show that it is difficult to demonstrate actual safety benefits for *on-product warning labels*.") (emphasis added) (not mentioning the words "audible" or "alarm" even once), attached hereto as Exhibit 7; Dorris, A., & Purswell, J., "Warnings and Human Behavior: Implications for the Design of Product Warnings," JOURNAL OF PRODUCTS LIABILITY, 1, 255–263 (1977) ("*Not all product warnings are of this type*, however, as in the example of a warning bell or buzzer which provides an auditory signal of impending danger." and "This process is called information sensing, which usually implies visual sensing of information for warning labels as compared to auditory information in the form of bells or buzzers.") (emphasis added), attached hereto as Exhibit 8.[4]

Indeed, of the two articles Dr. Arndt cites in Opinion 4 that even mention audible alarms, they acknowledge that audible alarms are distinct from on-product warning labels. Moreover, the literature Dr. Arndt cites does not support his opinion that warning labels and audible alarms are interchangeable and that no amount of additional warnings or instructions from Defendants would have altered Sun's employees' behavior. Rather, the literature suggests that users do *not* necessarily tune out or ignore audible alarms, except in the cases of habituation, which does not apply here.[5]  To the extent that Dr. Arndt opines that prior fires at the US Ink facility had habituated Sun workers to audible alarms, which would be a generous interpretation of his report, those prior fires did not trigger alarms, as even he acknowledged.  *See* Arndt Dep. at 218:2-8 ("Q. In the two prior fires, the building was

---

[4] This article focused on studies of human responses to warning labels, design parameters for warning labels, and further research needed on designing warning labels to improve user perception.
[5] The alarm associated with the Fike system is not a continuous alarm and and, and therefore, there would be no risk of habituation.

evacuated, right? A. No, the first one at the bag dump station, there was no response that led to a building-wide evacuation *or even a triggering of the fire alarm in the building*.") (emphasis added).[6] Therefore, Sun employees could not have become habituated to audible alarms. Moreover, Greg Gualdarrama (whose deposition transcript Dr. Arndt did not review)[7] testified that when he first arrived in the premix room, the fire had not yet started, meaning there was no reason to evacuate (particularly in the absence of an audible alarm from the Fike system). *See* Gualdarrama Dep. Tr. at 68:1-69:6 (after seeing "a flash, . . . [w]e were looking around and everything looked okay. All of a sudden, I can't remember who, but they said there was a fire starting on I think 306 -- let me get my numbers right -- 306. I looked up there. There was a flame."), attached hereto as Exhibit 9. Importantly, the entire event – from the initial sound and flash that attracted attention of the workers, to the explosion in which seven workers were burned – took place in only a matter of minutes, and several employees were injured even as they were in the process of leaving the area. *See* Cholin Rep. at 39-40, attached hereto as Exhibit 10; Myers Rep. at 2-4; Jaje Dep. Tr. at 60:1-6 (Jaje had turned away from the premix and was walking back in the direction of the shot mill area when the explosion occurred), attached hereto as Exhibit 11.

The Court is not required to accept Arndt's *ipse dixit* testimony that audible alarms and warning labels are essentially the same, simply because he says so. *See Joiner*, 522 U.S. at 146 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the

---

[6] As for the second fire in 2008, the fire alarm was pulled *after* Sun employees had attempted and failed to extinguish the fire. *See* Mar. 5, 2008 Sun Incident Report (SUN00014662), attached hereto as Exhibit 12.

[7] *See Crowley*, 322 F. Supp. 2d at 542 ("The information upon which an expert bases his testimony must be reliable, and the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703, which, in addition to Rule 702, must be considered by a court for *Daubert* purposes.").

expert."); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) ("Noettl's *ipse dixit* does not withstand *Daubert's* scrutiny. An expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation.").

Indeed, Dr. Arndt lists Laughery, K., & Wogalter, M., "Warnings and Risk Perception," Handbook of Human Factors and Ergonomics (2nd ed., 1997) in the "References" section of his report, and this publication stated:

> Auditory Warnings: Auditory warnings usually have as their primary purpose to attract attention. One advantage of such warnings over visual warnings is that auditory signals are omnidirectional, so the receiver does not have to be looking at a particular location to be alerted. Like print warnings, their success on the attention criterion is largely a matter of salience. *Auditory warnings should be more intense and distinctively different from expected background noise.*

*Id*. at 1183 (emphasis added), attached hereto as Exhibit 13. This is precisely the point that Dr. Murphy is making: that the "audible" alarm in the Fike system should have actually been *audible*, consistent with the representations Fike made.

Second, Dr. Arndt's report is internally contradictory. In one section, he claims that "[t]he injuries that occurred were a result of . . . a failure of workers to either have been trained properly to respond to fires or a failure to follow their training." Arndt Rep. at 13-14. Later, however, he claims that further training on warnings would not have prevented their injuries. *See* Arndt Rep. at 19-20 ("It is not reasonable to expect that Fike or SSI could have altered the behaviors of the workers or management at US Ink through their supplying additional warnings *or instructions*," and "[t]here is no scientific basis provided by Plaintiff experts that supports an opinion that *any additional warnings*, *signage training* within the scope of responsibilities of a component part manufacturer would have altered the safety critical behaviors of the US Ink employees sufficiently to prevent the injuries.") (emphasis

added); *see also* Arndt Dep. Tr. at 210:17-212:2; 216:6-10 ("we've just been discussing the fact that training wouldn't have affected the behaviors of the employees.").  Such internal inconsistencies render Arndt's opinion on the subject of training in Opinion 4 unreliable, and therefore, inadmissible.

Third, Arndt testified at his deposition that the workers would not have evacuated with more training or a building-wide alarm because they saw an actual deflagration and still did not evacuate.  *See* Arndt Dep. Tr. 217:10-22.  Yet, it is apparent from his testimony that he did not consider that Sun employee evacuation training was tied to hearing an audible alarm, that the fire was relatively small and contained, and the plant workers had prior experience with similarly small, contained fires in the same premix room, none of which had led to explosions.  *See* Arndt Dep. Tr. 217:10-220:10.[8]  Moreover, Dr. Arndt failed to consider the extensive training Sun employees received during the annual fire/evacuation drills, where Sun employees were required to evacuate upon hearing an alarm.  *See, e.g.*, Jaje Dep. Tr. at 38:22-39:17 ("once the alarm goes off, you had to go out the nearest door."); Caddell Dep. Tr. at 193:6-11, attached hereto as Exhibit 14; Prenenski Dep. Tr. at 60:7-10 ("When we hear a fire alarm we're supposed to evacuate the building."), 89:10-90:5, attached hereto as Exhibit 15.

Dr. Arndt did not review prior incident memos (detailing successful evacuations following initiation of an alarm) or the specific emergency response plan for the US Ink facility, either, so his conclusion that workers would not have evacuated with more training or upon hearing a building-wide alarm is pure speculation, not grounded in any facts.  *See* Arndt Dep. Tr. at 146:1-10.  *Crowley*, 322 F. Supp. 2d at 542 ("The information upon which

---

[8] Walter Frank also acknowledged that the prior fires had several distinguishing characteristics from the Incident.  *See* Frank Dep. Tr. at 203:4-205:14, attached hereto as Exhibit 16.

an expert bases his testimony must be reliable, and the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703, which, in addition to Rule 702, must be considered by a court for *Daubert* purposes."); *ZF Meritor*, 696 F.3d at 290 ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

Fourth, Dr. Arndt did not recall what the training requirements are in NFPA 69 or 654, which is not surprising, as these are standards on which he is not an expert (*see supra*), and it is not clear whether he took those training requirements into account in framing his opinion. *See* Arndt Dep. Tr. 150:18-151:5. He also did not know what training Defendants actually provided to Sun related to the Fike system, and he acknowledged he was not providing an opinion as to whether that training was adequate or not – which is a glaring omission if he is to reach his conclusions. *See* Arndt Dep. Tr. 146:11-147:16; 148:23-149:10; 215:17-217:4. Had he looked into the so-called training Defendants provided to Sun, he may have altered his conclusions, as Defendants failed to provide Sun employees with any meaningful training on the Fike system, despite Sun's request for comprehensive training. *See* Joshua Smith (SSI) Dep. Tr. 87:21-88:4 (confirming that he filled out a form indicating that "[c]ustomer [Sun] is requesting more detailed training."), attached hereto as Exhibit 17; DeMarco (SSI) Dep. Tr. at 75:21-76:9 (identifying Scot Smith as the project manager who would have conducted more detailed training), attached hereto as Exhibit 18; Scot Smith (SSI) Dep. Tr. at 137:21-138:13 ("Q. What type of training does SSI provide in connection with the system startup? A. I'm not really sure. Q. That's not something that you do personally? A. No."), attached hereto as Exhibit 19. Instead, Sun employees received only

a cursory orientation.  *See* Joshua Smith (SSI) Dep. Tr. at 81:3-11 (estimating that a Fike system orientation "could be an hour" or "could be four hours"), DeMarco (SSI) Dep. Tr. at 77:4-11 (estimating that a limited Fike system training that technicians provide could be "20 minutes" or an hour and a half); Jaje Dep. Tr. at 83:8-13 ("Q. Do you recall how long the training lasted? A. Maybe 10 minutes."); Castro Dep. Tr. at 131:7-8 ("The man was there very briefly."), 178:19-22 ("the training was very brief . . . ."), attached hereto as Exhibit 20. Rather than the "more detailed training" Sun requested, Sun employees were simply told to "call Fike" if the indicator light was any color other than green.  *See, e.g.*, Caddell Dep. Tr. at 182:24-183:18 (". . . can you tell me everything that you remember about that training? A. . . . the only thing I remember him specifically saying was if the board reads anything -- if it is showing any other color but green, to give them a call. Q. Were you told to do anything other than to give them a call? A. No.  Q. Were you told to evacuate the building if the light were anything other than green? A. No."); Jaje Dep. Tr. at 82:3-23 ("he briefly kind of gave us this quick overview of this panel, saying, you know, what is this, and just showing us that the lights, if they are green, everything is -- I just remember him saying if it's green, everything is okay, yellow means there might be something wrong, and then red one, obviously there is a problem, something like that. It was pretty very, you know, brief."); Castro Dep. Tr. at 208:20-23 ("Q. And you recalled also that as far as the system itself, the Fike people told you if there's a problem, call us, right? A. Yes.").

Dr. Arndt was vague on his recollection, conveniently enough, of whether any of the workers testified to hearing an alarm at the time of the Incident.  *See* Arndt Dep. Tr. 112:6-10; 113:11-21.  As it happens, every single witness who was asked whether he heard an alarm has testified he *did not hear* any alarm from the Fike panel (or otherwise) prior to the

Incident.  (*See, e.g.*, Jaje Dep. Tr. at 79:12-14 ("Q: Okay.  When - on October 9th, 2012, did you hear an alarm at any point? A. Nothing, nothing at all."); Caddell Dep. Tr. at 183:20-184:13 ("Q. Was there an alarm, an audible alarm associated with the system? A. No. . . . Q. Did you hear any alarms at any point on October 9th? A. No."); Castro Dep. Tr. at 164:10-13 ("Q. Do you recall hearing a fire alarm or any kind of alarm at any time before the fire extinguisher was used? A. I didn't hear anything."); Prenenski Dep. Tr. at 88:25-89:2 ("Q. Did you hear an alarm at any time on October 9th that you can recall? A. No."); Aug. 27, 2015 Marvin Ross Dep. Tr. at 63:19-20 ("Q. Did you ever hear an alarm? A. No."), attached hereto as Exhibit 21; June 21, 2016 William Wright Dep. Tr. at 194:14-16 ("On the day of the incident, do you recall hearing alarms at any point in time? A. No."), attached hereto as Exhibit 22.

It is apparent that Dr. Arndt did not review the deposition transcripts of *any* of these Sun employees, presumably because defense counsel did not supply him with them, or he simply ignored such testimony.  *See* Arndt Rep. at 22-23 ("List of Reviewed Materials"). Certainly, he could not conclusively recall whether Sun employees had testified they had heard an alarm prior to the Incident.  *See* Arndt Dep. Tr. at 112:6-10 (I don't believe that there is, if I'm recalling correctly, anyone who testified as to hearing the audible alert from the control panel or recalling hearing it.").  The failure to consider any of the employee testimony on this point further undermines the reliability of Opinion 4.  *See Crowley*, 322 F. Supp. 2d at 542 ("The information upon which an expert bases his testimony must be reliable, and the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703, which, in addition to Rule 702, must be considered by a court for *Daubert* purposes."); *see also Heller*, 167 F.3d at 155 ("[T]he reliability analysis applies to all

aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion."); *ZF Meritor*, 696 F.3d at 290 ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").  Thus, Arndt's Opinion 4 is wholly unreliable, and the Court should exclude it.

For the foregoing reasons, this Court should exclude Arndt's Opinions 1, 2, and 4 in their entirety.

## III.    <u>CONCLUSION</u>

Dr. Arndt is not qualified to opine on whether the alarm within the Fike system was FM-compliant (Opinion 1), utilizes Signal Detection Theory to determine in hindsight that Fike's marketing and promotion materials "were factually accurate" (Opinion 2), which is irrelevant and unhelpful to the jury in a NJCFA action, and speculates that "[a]dditional or alternative warnings and/or instructions from Fike/SSI would not have altered the behaviors of" Sun employees (Opinion 4), relying on grossly incomplete facts and literature pertaining to *written* warnings, which are distinct from *audible* alarms and live training. Accordingly, Sun respectfully moves the Court to find that Dr. Arndt's Opinions 1, 2, and 4 are inadmissible.

Dated: December 9, 2016                    MORGAN, LEWIS & BOCKIUS LLP

                                           /s/ Stephanie Feingold
                                           _____
                                           John McGahren
                                           Stephanie R. Feingold
                                           502 Carnegie Center
                                           Princeton, NJ 08540
                                           Tel: +1.609.919.6600
                                           Fax: +1.609.919.6701
                                           john.mcgahren@morganlewis.com
                                           stephanie.feingold@morganlewis.com
                                           *Attorneys for Plaintiff Sun Chemical Corporation*