**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SUN CHEMICAL CORPORATION,

      *Plaintiff,*

    v.

FIKE CORPORATION AND SUPPRESSION SYSTEMS INCORPORATED,

      *Defendants.*

Civil Action No. 13-4069 (JMV)

**OPINION**

**John Michael Vazquez, U.S.D.J.**

      This case arises from an explosion that occurred at Plaintiff Sun Chemical Corporation's ("Sun" or "Plaintiff") ink manufacturing plant in East Rutherford, New Jersey. Plaintiff alleges that Defendant Fike Corporation ("Defendant Fike") and Defendant Suppression Systems, Inc. ("Defendant SSI") (collectively, "Defendants") violated New Jersey's Consumer Fraud Act ("CFA") when Defendants allegedly affirmatively misrepresented the characteristics of their product intended to protect against certain fires and explosions. Both Defendants, D.E. 167, and Plaintiff, D.E. 168, have moved for summary judgment, pursuant to Federal Rule of Civil Procedure 56. The Court reviewed all submissions,[1] and considered the motions without oral

---

[1] In this Opinion, Plaintiff's Complaint (D.E. 1) will be referred to as "Compl." Plaintiff's brief in support of its motion for summary judgment (D.E. 168) will be referred to as "Pl. Br." Defendants' brief in opposition (D.E. 183) will be referred to as "Defs. Opp. Br." Plaintiff's reply brief (D.E. 190) will be referred to as "Pl. Reply." Defendants' brief in support of their motion for summary judgment (D.E. 167) will be referred to as "Defs. Br." Plaintiff's brief in opposition (D.E. 180) will be referred to as "Pl. Opp. Br." Defendants' reply brief (D.E. 189) will be referred to as "Defs. Reply."

argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, Defendants' motion for summary judgment is **GRANTED** and Plaintiff's motion for summary judgment is **DENIED**. As a result of the summary judgment decision, the Court dismisses the related *Daubert* motions as moot.

## I. BACKGROUND

Plaintiff is a corporation organized under the laws of Delaware. Plaintiff Statement of Material Facts ("Pl. SOMF") at ¶ 1. Sun is an international producer of printing inks and pigments, Pl. SOMF at ¶ 8; Defendants' Statement of Material Facts ("Defs. SOMF") at ¶ 9, and operated an ink production facility (the "Facility") in East Rutherford, New Jersey, Pl. SOMF at ¶ 8; Defs. SOMF at ¶ 10. Defendant Fike is a corporation organized under the laws of Missouri. Pl. SOMF at ¶ 2. Defendant SSI, a corporation organized under the laws of Pennsylvania, is a wholly owned subsidiary of Defendant Fike. Pl. SOMF at ¶¶ 3-4. Defendant SSI provides "comprehensive fire protection solutions through fire suppression, fire alarm and explosion protection systems." Pl. SOMF at ¶ 6. The explosion protection system that SSI sold to Sun is at issue in this case. Beginning in 2010 or early 2011, Plaintiff began considering a new dust collection system, including an explosion protection system, for its black ink pre-mix operations at the Facility. Pl. SOMF at ¶¶ 10, 13-14; Defs. SOMF at ¶¶ 19-21.[2] Sun sought an explosion protection system, with isolation and suppression capabilities, for the new dust collection system. Pl. SOMF at ¶¶ 13, 47. In other words, Plaintiff wanted the explosion protection system integrated with the dust collection structure. Plaintiff indicates that it was aware of, but not familiar with, such isolation

---

[2] Defendants claim that Sun Chemical began planning for the implementation of a new dust collection system in 2010, while Plaintiff claims that it was 2011. Defs. SOMF at ¶¶ 19-21; Pl. SOMF at ¶ 10.

systems. Pl. SOMF at ¶ 57 ("Sun had little to no experience with chemical explosion suppression and isolation systems, and specifically sought out the advice and expertise of explosion protection professionals Fike and SSI and relied on their expertise. In particular, Sun was generally unfamiliar with the use of chemical isolation devices to protect against 'blowback,' i.e., a deflagration in [the] dust collector . . . blowing back into the building and all the connections." (Internal quotations omitted)). Plaintiff contacted Faber Industrial Technologies ("Faber") concerning the dust collection system. Faber in turn asked United Air Systems ("UAS"), who manufactured dust collection systems, to provide information to Plaintiff. Pl. SOMF at ¶ 15; Defs. SOMF at ¶ 23. UAS also asked Defendants Fike and SSI to contact Plaintiff regarding the explosion protection system. Pl. SOMF at ¶ 15. In early 2011, representatives of Plaintiff and Defendant SSI began communicating about explosion suppression systems. Pl. SOMF at ¶ 16; Defs. SOMF at ¶¶ 22-25.

Between March and May 2011, and between March and June 2012, Defendants sent Plaintiff information and materials. Pl. SOMF at ¶¶ 25-26, 36, 44-47. First, on March 28, 2011, Defendant SSI sent Plaintiff two marketing materials: (1) a Fike Explosion Protection Application Profile for Dust Collection Systems ("Fike Profile") that provided a basic explanation of explosion hazards and dust collections systems, and (2) a Fike Protection Application Bulletin ("Fike Bulletin") which was essentially marketing information. Pl. SOMF at ¶¶ 25-29; *see* Defs. SOMF at ¶ 30-32. Both the Fike Profile and the Fike Bulletin stated that its products were in compliance with National Fire Protection Association ("NFPA") and FM Approvals ("FM") standards. Pl. SOMF at ¶¶ 32-33. Also on March 28, 2011, Defendant SSI sent an Explosion Protection Proposal (2011 SSI Proposal") to UAS that stated in part: "Per the requirements of NFPA 69 and 654, [Defendant SSI is] proposing" a specific type of system called an "Active Fike EPACO" explosion

protection system ("Fike System"). Pl. SOMF at ¶ 36. Faber incorporated the language that SSI sent to UAS into a Faber proposal form. Pl. SOMF at ¶ 38.

Faber then sent its proposal ("2011 Faber Proposal") to Plaintiff. Pl. SOMF ¶ 39; Defs. SOMF at ¶¶ 25, 35. The proposal included language that stated "[p]er the requirements of NFPA 69 and 654, we are proposing" a Fike System. Pl. SOMF at ¶ 40. Defendant SSI then sent two revised proposals to UAS and Faber on March 19 and 30, 2012 ("2012 SSI Proposal"). Pl. SOMF at ¶ 44. On April 3, 2012, Faber submitted its final proposal ("2012 Faber Proposal") to Plaintiff. Pl. SOMF at ¶ 45. The 2012 Faber Proposal stated, in part, that "[p]er the requirements of NFPA 69 and 654, we are proposing" to provide Plaintiff with a Fike System "to detect, and chemically isolate a deflagration originating in the Dust collector." Pl. SOMF at ¶ 45. A central issue in the case concerns Defendants' representations concerning an audible alarm as part of the Fike System. Plaintiff contends that Defendants represented that the Fike System had an audible alarm because it complied with NFPA 69. Pl. SOMF at ¶ 54. Plaintiff also claims that "Fike/SSI affirmatively represented to Sun (and all other recipients of these standard manuals and data sheets) that the Fike system had an audible alarm in the Fike Manuals and Data Sheets (the "Fike Manual") that were included as part of the SSI Engineering Submission dated May 30, 2012." Pl. SOMF at ¶ 54 (citing SUN00000007-37 at SUN00000193, SUN 00000195, SUN00000201, SUN00000244 (Exhibit 5)). However, in examining Plaintiff's Exhibit 5, the Court finds no mention of an audible alarm.[3]

---

[3] In its motion, Plaintiff briefly argues that Defendants' "manuals clearly stated that the Fike panel had an audible alarm and that once the Fike system discharged and entered "Alarm State," the alarm would continuously sound." Pl. Br. at 17 (citing Pl. SOMF at ¶ 54). Again, however, the Court finds no reference to an "Alarm State" in Exhibit 5 as cited in Pl. SOMF at ¶ 54. Accordingly, Plaintiff's motion primarily focuses its arguments on the Fike System's compliance with NFPA 69. See Pl. Br. at 19-20; Pl. Reply at 9-11.

In May 2012, Plaintiff purchased the new dust collection system that included the Fike System. Pl. SOMF at ¶ 60. According to Defendants' diagram, the actual dust collector was located on the roof of Plaintiff's Facility, while other parts of the system were inside the Facility itself. Defendants further assert that the Fike System was designed with an explosion suppression container for the dust collector on the roof. Defendants add that the only portion of the Fike System within the facility was the control panel ("Fike Panel"). Defs. Opp. at 3. According to Plaintiff's expert's diagram, the Fike Panel was located outside the pre-mix room, across an adjacent room. D.E. 131, Exhibit B (hereinafter "Murphy Report") at 27.

On September 14, 2012, SSI sent representatives to install the Fike System at the Facility. Pl. SOMF at ¶ 62. A few days later, on October 1, 2012, an SSI employee completed the installation process and gave an orientation presentation to Plaintiff's staff. Pl. SOMF at ¶ 66. Plaintiff claims that this orientation was inadequate in light of the fact that Plaintiff had requested a "more detailed training," after it bought the Fike System, on a form submitted to Defendants. Pl. SOMF at ¶¶ 63, 67-71.

On Tuesday, October 9, 2012, Plaintiff began regular operations with the new dust collection system. Pl. SOMF at ¶ 79. At approximately 1:10 PM on October 9, 2012, there was a loud noise followed by a small fire observed on top of a mixer in the pre-mix room. Pl. SOMF at ¶¶ 80-82; Defs. SOMF at ¶ 64. Two of Plaintiff's employees attempted to use a fire extinguishers to put the fire out, Pl. SOMF at ¶83, however, a larger ball of flames then materialized in the pre-mix room, Pl. SOMF at ¶ 84. The incident injured seven of Plaintiff's employees, who were in the pre-mix room at the time of the fireball. Pl. SOMF at ¶ 86. Plaintiff contends that the Fike System was supposed to include an audible alarm capable of being heard by workers close to the

Fike Panel. Pl. SOMF at ¶ 76. Plaintiff further asserts, however, that the injured employees heard no alarm. Pl. SOMF at ¶ 87.

After the explosion, a number of government agencies, including the Occupational Safety and Health Administration ("OSHA") and the Chemical Safety Board ("CSB") opened investigations. Pl. SOMF at ¶ 102. Plaintiff was unable to use the Facility until December 10, 2012 due to the CSB investigation. Pl. SOMF at ¶¶ 104, 110. During the investigations, Plaintiff had other facilities manufacture black ink and ship it to the Facility so it could be distributed, adding additional costs. Pl. SOMF at ¶¶ 117-118. Although Plaintiff attempted to restore operations, Plaintiff ultimately shut down its black ink production at the Facility. Pl. SOMF at ¶¶ 113-114. Plaintiff asserts that as a result of the fireball, it was forced to pay worker's compensation claims for its injured workers as well as incur legal fees and expenses in related litigation. Plaintiff adds that the explosion destroyed $6,015.55 worth of raw materials, Pl. SOMF at ¶ 100, and caused Plaintiff to incur expenses cleaning the Facility site and transporting salvaged equipment to Plaintiff's other facilities, Pl. SOMF at ¶ 101. In total, Plaintiff claims that Defendants' misrepresentations cost Plaintiff $1,264,167.05 in workers' compensation costs, $1,976,471.66 in administrative costs, $227,162.45 in additional labor costs, $958,699.16 in distribution costs, $219,506.42 in property-related costs, and $528,566.85 in litigation costs. Pl. SOMF at ¶¶ 141-147, 152-154.

## II. PROCEDURAL HISTORY

On July 1, 2013, Plaintiff filed its initial Complaint. D.E. 1. Defendant filed an amended motion to dismiss on March 14, 2014, D.E. 31, and the Court denied the motion on March 2, 2015, D.E. 71, and also denied a motion to reconsider on June 29, 2015, D.E. 92, 93. On May 22, 2015,

Defendants filed an Answer. D.E. 86. The case was reassigned to this Court on February 23, 2016. D.E. 113. Following fact and expert discovery, the parties filed the current motions.

## III. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In other words, a court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify

specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## IV. ANALYSIS

### a. The Complaint

Plaintiff claims that Defendants violated the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. § 56:8-1[4] by engaging in "unconscionable commercial practices, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts" related to promises made about the performance of the Fike System. Compl. at ¶¶ 66-75. Specifically, the Complaint claims that after the fire began in the pre-mix dust collection system, "the Fike explosion protection system was triggered, releasing pressure and suppressant agent into the dust collection system, which resulted in a fire and explosion that injured numerous workers and caused severe damage to the Facility." Compl. at ¶ 47. Plaintiff also claims, in part, that "[a]s a direct result of the activation of the Fike system and failure of the Fike system to suppress and isolate the fire, an explosion and fire occurred at the Facility that injured seven Sun

---

[4] The Court exercises jurisdiction over Plaintiff's New Jersey state law claims under the CFA pursuant to 28 U.S.C. § 1332 because the parties' are in complete diversity of citizenship and the amount in controversy is in excess of $75,000.

employees" and caused other damages. Compl. at ¶ 50. This "Blowback Theory" is prominent throughout the Complaint.

As an initial matter, and as Defendants call attention to, Plaintiff seems to almost completely abandon this Blowback Theory in its motion for summary judgment. Defs. Opp. at 5-7. Instead of the Blowback Theory, Plaintiff's motion argues that the Fike System either did not have an audible alarm as Defendants promised, Pl. Br. 32-34 ("[H]ad the Fike system contained an audible alarm, as promised by Fike/SSI, Sun's workers would have, pursuant to their training, evacuated the building upon hearing the alarm."), or that the audible alarm did not function as promised, Pl. Br. at 18-19 ("[Plaintiff's expert] determined that the Fike system alarm, which had a less than 5 dB reading . . . was not considered audible by [certain industry standards]."). Plaintiff now claims that Plaintiff's workers did not leave the explosion area and were injured by the explosion because they did not hear any alarm. Pl. Br. 32-34. The Complaint, however, fails to raise this theory of liability (hereinafter the "Alarm Theory"). In fact, the Complaint only mentions an alarm once, in passing, and never discusses any absence or failure of any audible alarm.[5] Plaintiff never amended its Complaint to assert its Alarm Theory. The Court agrees with Defendants that Plaintiff changed its theory of the case after filing its Complaint. However Defendants fail to request any relief based on Plaintiff's modification. Therefore, the Court considers Plaintiff's *post hoc* Alarm Theory on the merits in deciding the motions.

---

[5] Paragraph 41 of the Complaint states: "On or about October 1, 2012, SSI represented that it performed additional activation and verification of the Fike isolation and suppression system, including (a) verifying the function of the *trouble/alarm relays operation* with the current dust collector interlock, and (b) installation and termination of both GCAs (gas cartridge actuators, located on the suppressant containers)" (emphasis added). This is the Complaint's only mention of an alarm related to the Fike System.

Plaintiff argues that summary judgment is appropriate under New Jersey's Consumer Fraud Act ("CFA"), N.J.S.A. 56:8–1 *et seq.*, because Defendants' alleged false promises and misrepresentations to Plaintiff constitute an "unlawful practice" in violation of the CFA. Defendants respond that they are entitled to summary judgment under the CFA and also because Plaintiff's CFA claims are subsumed by New Jersey's Products Liability Act ("PLA"), N.J.S.A. 2A:58C-2 *et seq.* The Court will first examine Plaintiff's claims under the CFA, then turn to the interaction between the CFA and PLA in the context of this case.

### b. New Jersey's CFA

Plaintiff argues that Defendants' actions violated the CFA and that summary judgment is appropriate because Plaintiff made certain false promises, including: (1) misrepresentations that the Fike System was compliant with FM, NFPA, and other industry standards, including (a) the requirement that the Fike System have an audible alarm, and (b) the representation that the Fike System was FM-compliant, requiring two pressure detectors, and prohibiting a NEMA-4 enclosure around the alarm; (2) a misrepresentation that Fike Systems had never experienced a failure in the field; (3) false promises that the Fike System would protect workers and plant equipment; and (4) a misrepresentation that Defendants would provide Plaintiff with more detailed training on the Fike System. Pl. Br. at 15.

The CFA "provides relief to consumers from fraudulent practices in the market place." *Lee v. Carter-Reed Co.*, 203 N.J. 496, 521 (N.J. 2010) (internal quotation omitted). "The statutory and regulatory scheme is also designed to promote the disclosure of relevant information to enable the consumer to make intelligent decisions in the selection of products and services." *Div. of Consumer Affairs v. Gen. Elec. Co.*, 244 N.J. Super. 349, 353 (App. Div. 1990). In order to recover under the CFA, a plaintiff must show "(1) an unlawful practice, (2) an 'ascertainable loss,' and (3)

a causal relationship between the unlawful conduct and the ascertainable loss." *Lee*, 203 N.J. at 521 (internal quotations and citations omitted).

As to the first element, the CFA defines an "unlawful practice" as follows:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

N.J.S.A. 56:8-2. "Proof of any one of those acts or omissions or of a violation of a regulation will be sufficient to establish unlawful conduct under the [CFA]." *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 19 (N.J. 1994).

"Unlawful practices fall into three general categories: affirmative acts, knowing omissions, and regulation violations. The first two are found in the language of N.J.S.A. 56:8-2, and the third is based on regulations enacted under N.J.S.A. 56:8-4." *Id.* at 17. "When the alleged consumer-fraud violation consists of an affirmative act, intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act." *Id.* "However, when the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent is an essential element of the fraud." *Id.* at 17–18; *see also Grullon v. Bank of Am., N.A.*, 2013 WL 9681040, at *5 (D.N.J. Mar. 28, 2013); *Gupta v. Asha Enterprises, L.L.C.*, 422 N.J. Super. 136, 147 (App. Div. 2011) ("In contrast to a claim of an actionable omission, which requires a finding that the defendant acted knowingly, one who makes an affirmative misrepresentation is liable under the CFA even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive."). "Under the CFA, there are six types of affirmative acts that are deemed unlawful: unconscionable commercial practices, acts

of deception, fraud, false pretenses, false promises, and affirmative misrepresentation." *Viking Yacht Co. v. Composite One LLC*, 385 F. App'x 195, 200 (3d Cir. 2010) (citing N.J.S.A. 56:8–2).

The second element, "ascertainable loss," is a "loss that is 'quantifiable or measurable'; it cannot be 'hypothetical or illusory.'" *Lee*, 203 N.J. at 522 (quoting *Thiedemann v. Mercedes–Benz USA, LLC*, 183 N.J. 234, 248 (N.J. 2005)). "In cases involving breach of contract or misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages." *Thiedemann*, 183 N.J. at 248.

To establish causation, the third element required by the CFA, "a consumer merely needs to demonstrate that he or she suffered an ascertainable loss 'as a result of' the unlawful practice." *Lee*, 203 N.J. at 522 (quoting N.J.S.A. 56:8-19). "A plaintiff must establish[] the extent of any ascertainable loss, particularly proximate to a misrepresentation or other unlawful act of the defendant condemned by the Consumer Fraud Act." *Ramanadham v. New Jersey Mfrs. Ins. Co.*, 188 N.J. Super. 30, 33 (App. Div. 1982). "In other words, the alleged unlawful practice must be a proximate cause of the plaintiff's ascertainable loss." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 606 (3d Cir. 2012). "CFA causation is not infinitely elastic in a but-for sense; a plaintiff's losses must be particularly proximate to a misrepresentation or unlawful act of the defendant condemned by the [CFA]." *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 437 (D.N.J. 2012) (internal quotations and citations omitted).

As described above, Plaintiff alleges four areas of misrepresentation: (1) that the Fike System complied with industry standards (both as to the alarm and as to the sensors), (2) that there had been no previous failures of the Fike System in the field, (3) that Plaintiff would be provided a more detailed training on the Fike system, and (4) that the Fike System would protect Sun's

workers and its plant equipment. Pl. Br. at 15. The first three of these alleged misrepresentations may be decided under the CFA without addressing Defendants' overarching argument that the PLA subsumes Plaintiff's CFA claims. Accordingly, the Court examines three of Defendants' four alleged misrepresentations under the CFA,[6] and finds that Plaintiff has failed to raise a genuine issue of material fact demonstrating that any of these alleged misrepresentations caused any of Plaintiff's alleged injuries.

### i. Compliance with Industry Standards

Plaintiff first claims that Defendants made multiple false statements "that the system being sold to Sun was in accordance with NFPA standards and FM approved." Pl. Br. at 16. More specifically, Plaintiff claims that Defendants made multiple statements to Plaintiff that the Fike System would comply with NFPA 69 and FM 5700. Pl. Br. at 16-17.

### 1. FM 5700

Plaintiff briefly argues that Defendants represented that the Fike System would be compliant with FM 5700 and therefore required the inclusion of two pressure detectors. Pl. Br. at 20-21. Plaintiff claims that because the provided Fike System "only contained one pressure detector, it was not, as Fike and SSI represented, FM approved, because Fike's own FM approvals required TWO pressure detectors." Pl. Br. at 20. Defendants counter that Plaintiff requested only one pressure detector – even after Defendants told Plaintiff that having only one pressure detector would take the Fike System out of FM compliance. Defs. Opp. at 27.

FM 5700 does, in fact, require two detectors. *See* D.E. 168-3, Ex. 24 (FM 5700 Section 4.4.2) ("Suppression systems shall be supplied with a minimum of two detectors."). However,

---

[6] Plaintiff's remaining claim – that Defendants' misrepresented that the Fike System would protect its workers and its plant equipment – is discussed *infra* in Section IV.C.

Plaintiff fails to provide any explanation as to how the inclusion of only one pressure detector caused Plaintiff any harm. Even if the Fike System did not meet the standards of FM 5700, and without considering Plaintiff's apparent request for only one pressure detector, the Court finds that Plaintiff fails to provide any evidence that the lack of a second pressure detector caused any of the alleged harm in this case. Plaintiff simply does not tie the lack of a second sensor to any of its alleged damages.

Plaintiff also claims that Plaintiff's claim that the Fike System was FM approved was a misrepresentation because "Fike's FM approval expressly did not take into account the effect of the Fike system's NEMA-4 enclosure, which Fike/SSI sold with the other Fike system components, and which SSI used to house the Fike panel components at the Facility." Pl. Br. at 21. Similarly, even if the enclosure took the Fike System outside of the bounds of FM approval, Plaintiff fails to explain how this misrepresentation caused Plaintiff any damages.

Therefore, the Court finds that Plaintiff has failed to show that there is any genuine issue of material fact regarding how the Fike System's lack of compliance with FM 5700 caused any of Plaintiff's alleged damages.

### 2. NFPA 69

Plaintiff also claims that Defendants affirmatively misrepresented that the Fike System would be compliant with NFPA 69, an industry standard that Plaintiff claims requires an audible alarm. Pl. Br. at 16-20. Plaintiff specifically contends that NFPA 69 adopts the audibility requirements of NFPA 72, and that the Fike System failed to meet NFPA 72's standards that the alarm sound at a certain audibility level. Pl. Br. at 19. Defendants do not challenge that NFPA 69 requires an audible alarm. Defs. Counterstatement of Material Facts ("Defs. CSOMF") at ¶ 21 ("NFPA 69 requires an audible alarm, however, the alarms are meant for operator interface and

not general occupant evacuation. The 'local, visible, and audible alarms' are for an operator charged with the responsibility of interfacing with the equipment only."). Instead, Defendant asserts that NFPA 69 does not, in fact, incorporate the audibility requirements of NFPA 72 and that the Fike System was fully compliant with NFPA 69. Defs. Opp. at 24-26.

Under the CFA, a "misrepresentation must be one that is material to the transaction and that is a statement of fact, found to be false, made to induce the buyer to make a purchase." *Gupta v. Asha Enterprises*, L.L.C., 422 N.J. Super. 136, 147 (App. Div. 2011) (citing *Gennari*, 148 N.J. at 607). To establish an affirmative misrepresentation under the CFA, Plaintiff need not show Defendants' knowledge of the falsity of the misrepresentation or show Defendants' intent to deceive Plaintiff. *Cox*, 138 N.J. at 17 (citing *Chattin v. Cape May Greene, Inc.*, 124 N.J. 520, 522 (N.J. 1991) (Stein, J. concurring)). An affirmative misrepresentation is "one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Gennari v. Weichert Co. Realtors*, 288 N.J. Super. 504, 535 (App. Div. 1996), *aff'd as modified*, 148 N.J. 582 (1997); *Viking Yacht Co.*, 385 F. App'x at 200 ("Whether the representation was false is relevant to whether it was a misrepresentation.").

A statement is material if:

> (a) a reasonable person would attach importance to its existence in determining a choice of action . . . ; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.

*Ji v. Palmer*, 333 N.J. Super. 451, 462 (App. Div. 2000) (quoting *Restatement (Second) of Torts* § 538(2) (1977)); *see Perri v. Prestigious Homes, Inc.*, 2012 WL 95564, at *6 (App. Div. 2012) ("A fact is material when it is important to the particular buyer's decision or would be important to the decision of a reasonable buyer."). In other words, "[f]or liability under the statute to attach, an

affirmative misrepresentation must have been on a 'critical issue.'" *Ziets v. Swim-Mor Pools & Spas*, 2009 WL 972604, at *2 (App. Div. 2009). In regards to an advertisement, "the test is whether an advertisement has the capacity to mislead the average consumer." *Union Ink Co. v. AT&T Corp.*, 352 N.J. Super. 617, 644-45 (App. Div. 2002) (citing cases) ("Even if an advertisement is literally true, it may be actionable if the overall impression [it] create[s] . . . is misleading and deceptive to an ordinary reader." (Internal citation and quotation omitted)).

As an initial matter, Plaintiff is making an unusual affirmative misrepresentation argument. In most cases, there is a clear affirmative statement. For example, in one CFA case, a real estate company told a buyer of the home that the home was located in Montville, when it was actually located in the Towaco section of Montville Township. *Vagias v. Woodmont Properties, L.L.C.*, 384 N.J. Super. 129, 136 (App. Div. 2006) (reversing the dismissal of buyer's CFA claim and remanding it for trial). In another case, a court found that if a magazine advertised sweepstakes recipients as "finalists" when the term "finalist" did not mean that the person had a greater chance of winning, it would be an affirmative misrepresentation under the CFA. *Miller v. Am. Family Publishers*, 284 N.J. Super. 67, 80 (Ch. Div. 1995).

Plaintiff's claim is different. It is more akin to an affirmative statement by incorporation. In this case, Plaintiff claims that because Defendants' materials stated that the Fike System would be compliant with NFPA 69, it was actionable because the audibility levels of the Fike System's alarms did not comply with NFPA 72. Of note, Plaintiff does not assert that Defendants affirmatively represented that its system complied with NFPA 72. Instead, Plaintiff reaches its conclusion by arguing that NFPA 69 incorporates NFPA 72. Unlike a verbal statement or a claim in an advertisement, Plaintiff does not assert that it was even aware of the fire alarm standard in NFPA 72 when it agreed to purchase the Fike System. Indeed, it is not clear to the Court that

Plaintiff was aware of the NFPA 72 fire alarm provisions when it filed the Complaint because it was not a theory of liability at the time. Thus, while Plaintiff is correct that an affirmative statement does not have to be relied on by a buyer for purposes of the CFA, Plaintiff has cited no cases indicating that Plaintiff can be unaware of such statement and nevertheless prevail. To the contrary, the statement still has to be material and induce the purchase.

Defendants' proposals cited the "requirements of NFPA 69 and 654."[7] Pl. SOMF ¶¶ 36, 39, 45; Defs. SOMF at ¶¶ 25, 35. NFPA 69 is an industry publication that provides standards for explosion protection systems. NFPA 69, Standard on Explosion Prevention Systems, 2008 Edition, D.E. 168-3, Ex. 21 at 69-1 ("2008 NFPA 69"). NFPA 69 *does* reference "audible alarms" in several sections, *see* 2008 NFPA 69, Sections 10.5.1, 10.5.2, 11.7.1, 11.7.2, however these specific provisions do not provide any required *level* of audibility.[8] Of note, the "audible alarms" apply only to the control panel of an explosion suppression and isolation system; the alarms do not apply to the system as a whole.

As noted, Plaintiff contends that the audibility levels described in NFPA 72 are incorporated into NFPA 69 by reference, Pl. Br. at 19; Pl. SOMF at ¶ 22, but this argument is unconvincing for a number of reasons. Plaintiff first claims "the alarm in the Fike system installed at the Facility was not audible." Pl. Br. at 5 (citing Pl. SOMF at ¶¶ 87-88). To support this statement, Plaintiff points to deposition transcripts of employees who testified that they did not

---

[7] Plaintiff does not argue in its motion that Defendants failed to meet the requirements of NFPA 654.

[8] The Court notes that Plaintiff cites NFPA 69 Sections 10.5.1 and 11.7.1 (misspelled as 10.7.1) to support its argument that NFPA 69 requires audible alarms in its SOMF at ¶ 21. However, NFPA 69 Sections 10.5.2 and 11.7.2 actually provide sounder footing that NFPA 69 requires audible alarms. Section 10.5.2 states, in part, that "The control panel shall, as a minimum, fully and continuously supervise the following components: . . . (9) Local visual and audible alarms." NFPA 69, Section 10.5.2. NFPA 69 Section 11.7.2 includes the same language.

hear any alarm, at any level, on the day of the explosion. Pl. SOMF at ¶¶ 87-88. However, Plaintiff's own expert, Dr. Patrick Murphy (hereinafter "Murphy"), later determined that the Fike panel "could be activated and could produce a qualitative sound," Pl. Br. at 18, and stated that testing showed that the alarm produced a sound less than 5 dBs at four testing locations within the Facility, Pl. Br. at 19. Plaintiff claims that these tested levels of audibility illustrate that the alarm was not sufficiently "audible" as required by the NFPA 72 standards. Pl. Br. at 18-20. Thus, Plaintiff's claim does not appear to be that the alarm was not audible at all (for its own expert reported that it was), but instead that it was not loud enough. Of course, this fact seemingly takes the case out of the CFA and into the PLA because Defendants provided what they represented – an audible alarm. Nevertheless, the Court will continue with the CFA analysis.

Plaintiff argues that NFPA 69 Sections 2.1 and 2.2 illustrate NFPA 72's incorporation into NFPA 69. Pl. Br. at 19; Pl. SOMF at ¶ 22.[9] However, the overarching reference, "Chapter 2," notes that it is referring to "Referenced Publications," not that those materials are incorporated. Section 2.1 states that "The documents or portions thereof listed in this chapter *are referenced* within this standard and *shall be considered part of* the requirements of this document." 2008 NFPA 69, Section 2.1 (emphases added). Section 2.2 lists a number of NFPA publications including "NFPA 72, National Fire Alarm Code, 2007 Edition" (hereinafter "2007 NFPA 72"). 2008 NFPA 69, Section 2.1. Plaintiff argues that because NFPA 72 is listed in Section 2.2, NFPA

_____

[9] In Plaintiff's motion, Plaintiffs argue that NFPA 69 incorporates the specific requirements of NFPA 72 by reference. Pl. Br. at 19. To support this claim, Plaintiff points to its SOMF at ¶ 22 and D.E. 149 at 21-23 (Plaintiff's motion to exclude the expert report and testimony of Patrick Murphy). In turn, Plaintiff's SOMF at ¶ 22 cites 2008 NFPA 69 Sections 2.1 and 2.2. D.E. 149 is Plaintiff's opposition to Defendant's motion to exclude the expert report and testimony of Patrick Murphy. In its opposition, Plaintiff argues that because Section 2.2 includes NFPA 72, all of NFPA 72 is incorporated into NFPA 69.

69 "incorporates NFPA 72 by reference" and therefore the audibility requirements of NFPA 72 apply to Defendants' promise that the Fike System would comply with NFPA 69. Pl. Br. at 19.

The Court finds that the language of NFPA 69 Section 2.1 is unclear because it indicates that the materials listed are both "referenced" and "considered part of" NFPA's requirements. In other words, the materials are seemingly both referenced and incorporated. Yet, considering Section 2.1 in the context of all of the publications listed in Chapter 2, as well as in the context of the entire document, it is unlikely that NFPA 69 intended to incorporate *all* of the listed publications, including all of NFPA 72's requirements.[10] The materials listed in Chapter 2 (Sections 2.2, 2.3, 2.3.1, 2.3.2, 2.3.3, 2.3.4, 2.3.5, 2.3.6, 2.3.7, and 2.4) are comprised of over twenty-five publications, including the entire 11th edition of Merriam-Webster's Collegiate Dictionary.

Thus, full incorporation of all referenced publication would turn NFPA 69, an already lengthy document at well over 100 pages (with double column spacing on each page), into literally thousands of pages, including a full dictionary. And the document would still continue to effectively grow. For example, if NFPA 69 incorporated NFPA 72 in full, it would also necessarily incorporate NFPA 72's own Chapter 2. NFPA 72's Chapter 2 contains identical language of reference/incorporation, stating that "[t]he documents or portions thereof listed in this chapter are referenced within this standard and shall be considered part of the requirements of this document." 2007 NFPA 72. NFPA 72 then lists a number of referenced publications in its own Chapter 2, including 13 NFPA publications and 15 industry publications. Then, following Plaintiff's logic,

---

[10] The Court notes that there is a clear disagreement between Plaintiff and Defendants' experts that is further described in the parties' respective *Daubert* briefings regarding whether NFPA 69 incorporates all of the requirements of NFPA 72. *See* D.E. 131, D.E. 149, D.E. 152. However, the Court is determining as a matter of law that NFPA does not fully incorporate NFPA 72.

NFPA 69 would not only incorporate the publications listed in NFPA's Chapter 2 but also any additional material set forth in the NFPA publications listed in NFPA 72. This incorporation upon incorporation upon incorporation seems to be unreasonable if not nonsensical and unwieldy.

Another example also demonstrates why Plaintiff's interpretation is not persuasive. Plaintiff asserts that Defendants' represented that the Fike System would be compliant with the "requirements of NFPA 69 and 654." Pl. SOMF ¶¶ 36, 39, 45; Defs. SOMF at ¶¶ 25, 35. However, NFPA 69 Chapter 2.2 already references NFPA 654. It would be redundant and superfluous for Defendants to guarantee that the Fike System would comply with both NFPA 69 and NFPA 654 because, under Plaintiff's reading, the requirements of NFPA 654 would already be incorporated into NFPA 69.

Defendants urge that the more natural reading of Chapter 2 of NFPA 69 is that referenced publications are not incorporated *in toto*, but instead are incorporated as explicitly referenced in NFPA 69. For example, NFPA 72 is referenced in NFPA 69 Section 15.5.5.2 (covering explosion prevention and control systems), which states in part, "Class A or Class B circuits *as described in NFPA 72, National Fire Alarm Code*, shall be employed when the following components are connected to the control panel . . . ." 2008 NFPA 69 at 69-32 (emphasis added). Of course, if Plaintiff's reading were correct, there would be no need for this additional, specific reference as the entirety of NFPA 72 would already be incorporated. There are many other examples within NFPA 69 where materials listed in Chapter 2 are also specifically referenced elsewhere in NFPA 69. *See, e.g.*, 2008 NFPA 69 § 10.3.1.1 (referring to "29 CFR 1910.147" and "29 CFR 1910.146" as to disarming, lockout, and tagout procedures).

The Court finds Defendants' reading more persuasive. The "audible alarms" referred to in NFPA 69 are distinct from the fire alarms relied on by Plaintiff in NFPA 72. Chapter 10 of NFPA

69 concerns "Deflagration Control by Suppression." Certain sections of the chapter directly address the system's design. For instance, Section 10.4.3.2 indicates what the system's design shall include, but makes no mention of a fire alarm. "Audible alarms" are only referenced in the context of the suppression system's control panel, such as in Sections 10.5.1, 10.5.2. Chapter 11 addresses "Deflagration Control by Active Isolation." Like Chapter 10, Chapter 11 in Section 11.4.2.2 expressly addresses system design but does not mention any alarm much less a fire alarm. Again, like Chapter 10, Chapter 11 only references "audible alarms" in the context of the control panel as indicated in Sections 11.7.1 and 11.7.2. Moreover, Defendants', as well as Plaintiff's own expert, correctly point out that NFPA 69 Chapters 10.5.1, 10.5.2, 11.7.1, and 11.7.2 reference "*local* visual and audible alarms" vis-à-vis control panels. Defs. CSOMF at ¶ 21; D.E. 131, Murphy Report at 21-22.

Applying Chapters 10 and 11 of the NFPA to this matter, the referenced audible alarm refers only to the Fike Panel, not the entire Fike System. Thus, Plaintiff's contention that the control panel alarm failed to conform to certain sections of Chapter 7 of NFPA 72, Pl. Br. at 19-20, is inapposite. Chapter 7 of the NFPA concerns "Fire Alarm Systems," not local, audible alarms on control panels. Here, Plaintiff had a separate fire alarm system.[11] If Plaintiff's fire alarm

---

[11] Plaintiff points to, in its SOMF at ¶ 97, an "Annual Fire Drill" on 8/29/12, D.E. 170, Ex. 69, as to its fire alarm system but points to no evidence that Plaintiff's employees were trained to evacuate once the Fike System's specific audible alarm rang. Plaintiff states that "[h]ad the workers heard an alarm on October 9, 2012, they would have evacuated the area," Pl. SOMF at ¶ 94, and cites deposition transcripts. However, the deposition transcripts Plaintiff cites to support this statement are not convincing. For example, John Castro's statement that workers were supposed to "leave the building, and call the fire department" if they heard an alarm seems to be referencing a fire alarm. D.E. 170, Ex. 52 at p.189. Eddie Caddell's statements also seem to reference fire alarms. D.E. 170, Ex. 61 (Caddell Deposition) at p. 67-70 ("We would also contact the police department, fire department that we're having a *fire drill*. And that was done annually, which is documented." (Emphasis added)) However, because Plaintiff selectively leaves out pages of multiple transcripts, the Court cannot determine the full context of the deponents' statements. *See* D.E. 170, Ex. 57 (Preneski Deposition); Ex. 60 (Gualdarrama

21

system did not work properly and caused injuries, then Plaintiff should look to the manufacturer or installer of such system, not Defendants. The Fike Panel was not located in the pre-mix room, where the employees were injured. Instead, it was located on a wall outside the room. To prevail, Plaintiff would need to show that someone was appropriately monitoring the control panel, there was no audible alarm, and the lack of alarm caused Plaintiff appreciable loss. Plaintiff has failed to point to such evidence.[12]

### ii. No Failures in the Field

Next, Plaintiff claims that Defendants' representation that "Fike systems never have experienced a system in the field" was false. Pl. Br. at 22. Plaintiff details a number of incidents that it claims constitute "failures" in the field – including "false activations" and "inadvertent field firings," Pl. Br. at 22, during which the Fike System's canisters fired inadvertently. When activated, the canisters are supposed to extinguish any flames in the dust collector. D.E. 168-2, Ex. 15 at 164-167; *see* Defs. Opp. at 4. According to Plaintiff, once the canisters activate, they must be recharged for the Fike System to properly function. Pl. Reply at 14; Pl. SOMF at ¶ 98

---

Deposition); Ex. 53 (Caddell Deposition). Plaintiff's own expert never mentions a fire alarm in the Fike System, stating that during the incident, the "Fike panel was in an alarm condition due to a potentially dangerous condition in the dust collection system," Murphy Report at 7, and that a "red LED illuminated in the Fike Panel indicates that the Fike system has detected a dangerous increase of pressure in the dust collection system above the pre-mix room indicative of an explosion and has activated means of suppressing an explosion in the dust collection system," *id.* at 7 n.4. Importantly, Murphy's report states that one employee testified that "the facility fire alarm system, *as opposed to the Fike alarm*, is recognizable and can be heard over ambient machinery noise in the facility." *Id.* at 7, n.6. Additionally, even if Plaintiff's employees had heard a fire alarm, the facts of this case show that a number of employees saw an actual fire in the pre-mix room, and attempted to put out the fire with a fire extinguisher before the explosion instead of evacuating. Pl. SOMF at ¶ 81-86.

[12] Even if Plaintiff made this showing, the Court would nevertheless find that Plaintiff's claim is subsumed by the PLA as is discussed below.

("The Fike system is a 'one-shot system.' Once it discharges, it cannot discharge again without being recharged."); Def. CSOMF at ¶ 98.

As noted, to establish liability under the CFA, a "plaintiff must establish[] the extent of any ascertainable loss, particularly proximate to a misrepresentation or other unlawful act of the defendant." *Ramanadham*, 188 N.J. Super. at 33. Here, however, Plaintiff fails to show how these misrepresentations are related to the alleged damages in this case. Plaintiff does not allege that there was a false activation or inadvertent firing of the Fike System's canisters on the morning of October 9, 2012, much less an inadvertent activation that caused Plaintiff's damages. Plaintiff simply fails to show any causal connection between Defendants' alleged misrepresentations regarding previous field failures based on the existence of premature activations and the harms associated with the October 9, 2012 incident. Such causation is required under the CFA. *Marcus*, 687 F.3d at 606 ("In other words, the alleged unlawful practice must be a proximate cause of the plaintiff's ascertainable loss [under the CFA].").  Plaintiff's argument may be tenable (assuming that it was not subsumed by the PLA) if Plaintiff could show that the Fike System inadvertently deployed its canisters and then a fire occurred before the system could be recharged. But Plaintiff does not do so. Therefore, Plaintiff fails to provide any evidence to show a genuine issue of material fact whether Plaintiff's alleged misrepresentations about previous failures in the field caused any of Plaintiff's alleged damages.

### iii. More Detailed Training

Plaintiff next claims that Defendants did not provide certain promised training to Plaintiff's employees. Pl. Br. at 26-27. Plaintiff claims that on September 14, 2012, it requested "a more detailed training" on the Fike System by checking a box on an authorization form that stated,

"Customer is requesting a more detailed training," Pl. Br. at 26; Pl. SOMF at ¶ 63, and that Plaintiff never delivered the promised training.

In support, Plaintiff notes that the CFA applies to "misrepresentation[s]" made "in connection with the sale or advertisement of any merchandise . . . *or with any subsequent performance*," N.J.S.A. 56:8-2 (emphasis added). However, courts have been clear that for a misrepresentation to be actionable under the CFA, "[t]he misrepresentation has to be one which is material to the transaction and which is a statement of fact, found to be false, *made to induce the buyer to make the purchase.*" *Gennari*, 288 N.J. Super. at 535 (emphasis added). Otherwise stated, the misrepresentation must have been made "to induce the buyer to make the purchase" of the products or services. *Cole v. Laughrey Funeral Home*, 376 N.J. Super. 135, 144 (App. Div. 2005). Thus, while the CFA contemplates that the misrepresentation may not be clear until there is subsequent performance with the product, the misrepresentation must nevertheless be at the time of, or before, the sale.

Here, Plaintiff purchased the Fike System in May 2012, Pl. SOMF at ¶ 60, but Plaintiff did not request a more detailed training until September 2012, Pl. SOMF at ¶ 63. Plaintiff does not allege that it was aware of the additional training option when it made the purchase. Because the alleged misrepresentations regarding additional trainings were made four months *after* Plaintiff had already purchased the Fike System, the representations could not have induced Plaintiff into purchasing the Fike System. *See Billings v. Am. Exp. Co.*, 2011 WL 5599648, at *10 (D.N.J. Nov. 16, 2011) (holding that "the alleged misrepresentations were made after the Agreements between Plaintiff and [Defendant] were already entered into and therefore not at a time when they may have induced Plaintiff's entering into the Agreements. . . . As such, these alleged misrepresentations do not amount to unlawful conduct for the purposes of the CFA and are not sufficient to state a CFA

claim."); *Court Plaza Assocs. v. Wausau Tile, Inc.*, 2015 WL 7783256, at *3 (App. Div. 2015) ("To constitute a CFA violation, the misrepresentation must be made *at the time of or prior to formation of* the contract to induce the creation of the contract." (Emphasis added)); *Prezant v. Jegou*, 2010 WL 2556882, at *5 (App. Div. 2010) (finding that alleged misrepresentations in a list "could not have been material [under the CFA] to the [plaintiffs'] decision to purchase because the list was prepared after the transactions were complete"); *Cole*, 376 N.J. Super. at 144 (finding that "acts done after the contract for funeral services was entered into . . . . were, therefore, not misrepresentations made to induce the buyer to make the purchase of funeral services."); *cf. Perth Amboy Iron Works, Inc. v. Am. Home Assur. Co.*, 226 N.J. Super. 200, 211, 543 A.2d 1020, 1026 (App. Div. 1988), *aff'd*, 118 N.J. 249, 571 A.2d 294 (1990) (holding that he CFA "encompass[es] the acts of remote suppliers, including suppliers of component parts, whose products are passed on to a buyer and whose representations are made to or intended to be conveyed to the buyer" even if the representations are made after the sale).

Plaintiff has not pointed to a genuine issue of material fact precluding summary judgment on the requested additional training.[13]

### c. Plaintiff's Remaining Claim: Misrepresentation of Fike System's Protection of Employees, Equipment, Systems

Plaintiff's remaining claim is that Defendants misrepresented that the Fike System would protect Plaintiff's workers and equipment. In addition to claiming that the misrepresentation does not violate the CFA, Defendants argue that Plaintiff's claims are subsumed by the PLA. Plaintiff,

---

[13] Defendants' also claim that, under the CFA, the Fike System was "merchandise" and that Plaintiff was not a "person." Defs. Opp. Br. at 7-18. The Court does not find these arguments persuasive. For example, as to merchandise, Defendants fails to show how *they* customized the Fike System. As to "person," for instance, Defendants merely demonstrate that Plaintiff was aware of isolation systems, not that Sun had the requisite level of knowledge and experience concerning such systems.

however, does not clearly delineate whether this final misrepresentation is due to the alleged failure of the alarm (discussed above) or due to a general failure of the Fike System (or some combination thereof). At a minimum, Plaintiff has not argued that pursuant to its Alarm Theory, its property (as opposed to its workers) would not have been damaged. The Court finds that as to the failure of the Fike System in general (that is, to not suppress and/or isolate the fire and prevent deflagration), the essence of Plaintiff's claim is one of products liability. Sun's CFA claim is therefore subsumed by the PLA. Although the Court rejected the Alarm Theory under the CFA due to a lack of causation, the Court also finds that the Alarm Theory is subsumed by the PLA given that the underlying harm is one of personal injury, that is, injuries to the employees in the pre-mix room.

In New Jersey, a products liability claim is defined as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J.S.A. 2A:58C–1(b)(3); *see Sinclair*, 195 N.J. at 62.[14] New Jersey courts recognize causes of action in product liability cases for design defects, manufacturing defects, and failures to warn. *Zaza v. Marquess & Nell, Inc.*, 144 N.J. 34, 49 (N.J. 1996) ("The term "defect" is not self-defining and has no universally accepted meaning suitable for every strict products liability case. . . . Defects are classified as design defects, manufacturing defects or inadequate warning defects." (Citations omitted)); *see Lewis v. Am. Cyanamid Co.*, 155 N.J. 544, 564 (N.J. 1998) ("A claim for failure-to-warn differs from one based on a design defect." (Citations omitted)). "Harm" is defined under the PLA as "(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death;

---

[14] There is also another exception for certain environmental torts, which is not applicable here. N.J.S.A. 2A:58C–6 ("The provisions of this act shall not apply to any environmental tort action.").

(c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph." N.J.S.A. 2A:58C–1(b)(2).

The PLA subsumes claims when "the *essential nature* of the claim presented . . . would traditionally be considered a products claim." *Rodnite*, 2010 WL 3079576, at *3 (emphasis added) (citing *New Hope Pipe Liners*, 2009 WL 4282644, at *2-3). "In 1987 the [New Jersey] Legislature enacted the PLA based on an 'urgent need for remedial legislation to establish clear rules with respect to certain matters relating to actions for damages for harm caused by products.'" *Sinclair v. Merck & Co.*, 195 N.J. 51, 62 (N.J. 2008) (quoting N.J.S.A. 2A:58C-1a). "[T]he Legislature intended . . . to limit the liability of manufacturers so as to balance[ ] the interests of the public and the individual with a view towards economic reality." *Sinclair*, 195 N.J. at 62 (internal quotations and citations omitted); *see Zaza v. Marquess & Nell, Inc.,* 144 N.J. 34, 47 (1996) ("The Act has been interpreted as evincing a legislative policy to limit the expansion of products-liability law." (Internal quotation omitted)). Essentially, "under New Jersey law, the PLA governs any 'products liability action.'" *Indian Brand Farms v. Novartis Crop Prot., Inc.*, 890 F. Supp. 2d 534, 539 (D.N.J. 2012).

The New Jersey Supreme Court has determined that "[t]he language of the PLA represents a clear legislative intent that . . . the PLA is paramount when the underlying claim is one for harm caused by a product." *Sinclar*, 195 N.J. at 66. The PLA subsumes claims when "the *essential nature* of the claim presented . . . would traditionally be considered a products claim." *Rodnite*, 2010 WL 3079576, at *3 (emphasis added) (citing *New Hope Pipe Liners*, 2009 WL 4282644, at *2-3); *see In re Lead Paint Litig.*, 191 N.J. at 437 ("Were there any doubt about the essential nature of the claims asserted by plaintiffs, a careful reading would demonstrate that they sound in products

liability causes of action."). "[C]ourts tend to look at the essence of the claims and decide whether or not the plaintiff is disguising what would traditionally be considered a products liability claim as an alternate cause of action." *New Hope Pipe Liners*, 2009 WL 4282644, at *2.

"Because the PLA generally subsumes common-law product liability claims, . . . the Third Circuit, the New Jersey District Court, and New Jersey State courts consistently have dismissed product liability claims based on common-law theories when those theories allege harm caused by a product." *Brown ex rel. Estate of Brown v. Philip Morris Inc.*, 228 F. Supp. 2d 506, 516 (D.N.J. 2002) (internal quotation and citations omitted). Importantly, even though the CFA itself has an expansive reach, it will nevertheless yield to the PLA when the essential nature of a claim sounds in products liability. *See Batchelor v. Procter & Gamble Co.*, 2014 WL 6065823, at *4 (D.N.J. Nov. 13, 2014) ("Though the CFA has a broad scope, a plaintiff cannot recast a viable products liability claim as a fraud claim under the CFA."). As a result, courts have repeatedly found that claims made under the CFA are subsumed by the PLA in light of the nature of the claim. *See, e.g.*, *Indian Brand Farms v. Novartis Crop Prot., Inc.*, 890 F. Supp. 2d 534, 547 (D.N.J. 2012); *McDarby v. Merck & Co.*, 401 N.J. Super. 10, 98 (App. Div. 2008); *Bailey v. Wyeth, Inc.*, 424 N.J. Super. 278, 333 (Law. Div. 2008), *aff'd sub nom. DeBoard v. Wyeth, Inc.*, 422 N.J. Super. 360 (App. Div. 2011). Indeed, the Supreme Court of New Jersey has determined that alleged CFA claims are subsumed by the PLA if the essence of the case sounds in products liability. *See Sinclair*, 195 N.J. at 65-66 (2008) (observing that, in a case involving the drug Vioxx and serious cardiovascular side effects, "despite the broad reach we give to the CFA, the PLA is paramount when the underlying claim is one for harm caused by a product. The heart of plaintiffs' case is the potential for harm cause by Merck's drug. . . . Consequently, plaintiffs may not maintain a CFA claim."). *Cf. In re Lead Paint Litig.*, 191 N.J. at 437 ("[W]e find no ground on which to conclude

that the claims being raised by plaintiffs, regarding an ordinary household product used by consumers, were excluded from the scope of [the PLA."). Simply put, courts have made clear that a plaintiff may not avoid the requirements of the PLA by artfully crafting its claims under the CFA.

That being said, certain claims clearly fall within the purview of the CFA rather than the PLA. For example, in *Gupta v. Asha Enterprises, L.L.C.*, 422 N.J. Super. 136, 146-47, (App. Div. 2011), the court ruled that the matter was subject to the CFA when the plaintiffs were provided meat, rather than vegetable, samosas. The PLA was inapplicable, ruled the *Gupta* court, because the wrong samosas were not defective as they were "safe, edible, and fit for human consumption[.]" *Id.* at 145-46. Another example would be if the buyer bought an otherwise properly functioning school bus based on the seller's representation that it sat sixty students, only to find that it could hold forty. By comparison, in *DeBenedetto v. Denny's Inc.*, 421 N.J. Super. 312, 327 (Law Div. 2010), the court determined that the plaintiff's CFA claim was subsumed by the PLA because the alleged harm focused on personal injury. Although the plaintiff asserted only economic damages (the cost of his Denny's meals), the court in *DiBenedetto* nevertheless found that the "core" of the claim was one of personal injury, that is, the health risks associated with the undisclosed and high sodium in the fast food. *Id.* at 322-23.

At the outset, Plaintiff argues that the PLA does not apply because it is alleging affirmative representations. In support, Plaintiff points to Judge Hochberg's short decision denying the motion to dismiss in this case, as well as to *New Hope Pipe Liners, LLC v. Composites One, LCC*, 2009 WL 4282644 (D.N.J. Nov. 30, 2009). Plaintiff is correct that certain language in the *New Hope* decision supports its view. In that case, the court determined that if a claim was "representation-based," it was not subsumed by the PLA. While this distinction provides a clear line of demarcation, the Court does not find it persuasive. Importantly, the CFA itself expressly provides

a cause of action for certain omissions. *See* N.J.S.A. 56:8-2 (stating that an "unlawful practice" under the CFA includes an "omission of any material fact with intent that others rely upon such concealment, suppression or omission"). Of course, the omission standard is more stringent than the affirmative representation requirements of the CFA, but if the Court accepted the "representation-based" distinction, it would effectively read the omission provision out of the CFA. In fact, courts in New Jersey have expressly rejected the distinction urged by Plaintiffs. *See, e.g., Bailey*, 424 N.J. Super. at 580-82 (finding that the plaintiff's CFA claim that the manufacturer of certain drugs affirmatively misrepresented their safety was subsumed by the PLA even as to the plaintiff's purely economic loss).

Instead, and as noted, the Court must focus on the essence of the claim. As to its Alarm Theory, Plaintiffs claim that they seek only to recover for economic losses, such as monies paid for worker's compensation and legal fees expended in the injured workers' related personal injury suit. Although a novel argument, Plaintiff cannot escape the conclusion that the underlying harm itself, the injuries to its workers, is squarely that of personal injury. If the personal injury to its employees had never occurred, then Plaintiff would not have paid any of its claimed economic damages. Like *DiBenedetto* and *Bailey*, the Court must analyze the actual harm caused regardless of the artfulness of Plaintiff's pleading. As the Appellate Division in *McDarby* cautioned, when a matter sounds in products liability, the New Jersey Legislature did not intend recovery under the CFA which would subject a defendant to treble damages and attorney's fees. 401 N.J. Super. at 98. Plaintiff's Alarm Theory is more properly construed as a manufacturing or design defect (because the alarm was not loud enough) or a failure to warn (for the same reason) which caused harm – the personal injuries to Plaintiff's employees.

Turning to the Blowback Theory, as noted, this was the theory of the case espoused in Plantiff's Complaint. Plaintiff's Blowback Theory advances that "once the deflagration commenced, the Fike system should have suppressed and isolated it (in accordance with Fike/SSI's representations), and protected Sun's workers instead of putting them in harm's way." Pl. Opp. at 24 (emphasis in original). For the most part, Plaintiff abandons the Blowback Theory at the summary judgment stage except as to Defendants' representation that the Fike System would protect Plaintiff's workers and equipment. Defendants argue that Plaintiff's CFA claims are subsumed by the PLA because the essential issues in the case are "whether the Fike system did or did not work, was or was not designed properly or did or did not provide essential warnings essential to its operation." Defs. Br. at 25. Plaintiff counters that the PLA is inapplicable to this case because the essential nature of Plaintiff's claims are "premised on (1) Sun's purchase of what turned out to be an *unsuitable* product from Defendants based on their misrepresentations and (2) Sun's resulting damages when the product failed to perform *as promised*." Pl. Opp. at 26 (emphasis in original). Notably, Plaintiff fails to indicate which alternate system would have been appropriate or suitable. *Cf. Petinga v. Sears Roebuck and Co.*, 2009 WL 1622807, *11 (D.N.J. Jan. 9, 2009) (ruling that the plaintiffs had presented sufficient evidence for a jury to find that the defendant had sold them a heating system that was the wrong size and capacity compared to other models).

The Blowback Theory presents a classic products liability claim. The Fike System was supposed to suppress deflagration and isolate the fire. It apparently, in light of the fireball that injured the employees in the pre-mix room, did neither. In fact, the Complaint makes a further allegation, that is, not only did the Fike System fail in its primary task, it actually exacerbated the situation. The Complaint states that after a fire began in the pre-mix dust collection system, "the

Fike explosion protection system was triggered, releasing pressure and suppressant agent into the dust collection system, which resulted in a fire and explosion that injured numerous workers and caused severe damage to the Facility." Compl. at ¶ 47. Thus, the Fike System suffered from a defective design and/or was manufactured incorrectly (and if Defendants knew of its limitations, it would have had a duty to warn or make safe). In other words, the Fike System was defective and caused harm, to both person and property. Such a claim falls clearly within the scope of the PLA as a products-based action. *See Lead Paint*, 191 N.J. at 437 ("This classic articulation of tort law duties, that is to warn of or to make safe, is squarely within the theories included in the PLA."); *Sinclair*, 195 N.J. at 66 (stating that "the PLA is paramount when the underlying claim is one for harm caused by a product"). Therefore, Plaintiff's CFA claims based on its Blowback Theory are subsumed by the PLA.

## V. CONCLUSION

For the reasons set forth above and for good cause shown, Defendants' motion for summary judgment (D.E. 167) is **GRANTED** and Plaintiff's motion for summary judgment (D.E. 168) is **DENIED**. Because Defendants' motion for summary judgment is granted, the parties' outstanding motions related to expert reports and opinions (D.E. 130, 131, 132, 133, 134, 135, 136, 137, 138, and 139) are dismissed as moot. An appropriate Order accompanies this Opinion.

Date: December 11, 2017

John Michael Vazquez, U.S.D.J.